453 S.E.2d 419

Sandra K. MICHAEL, as Administratrix and Personal Representative on Behalf of the ESTATE OF Randi Nichole MICHAEL, Plaintiff Below, Appellant

v.

Francisco D. SABADO, Jr., M.D., Defendant Below, Appellee.

No. 22032.

Supreme Court of Appeals of West Virginia.

Submitted Oct. 4, 1994.

Decided Dec. 21, 1994.

Laura Coltelli Rose, Ronald M. Harman, Martinsburg, for appellant.

Richard L. Douglas, Claudia W. Bentley, Bowles, Rice, McDavid, Graff & Love, Martinsburg, for appellee.

CLECKLEY, Justice:

The plaintiff below and appellant, Sandra K. Michael, appeals from a jury verdict finding no liability in a wrongful death/medical malpractice case. This civil action arose from the death of the plaintiff's four year old daughter, Randi Nichole Michael, who died five days after Francisco D. Sabado, Jr., M.D., the defendant below and appellee, performed a tonsillectomy.

## I.

### FACTS

On November 21, 1988, Randi Nichole Michael hemorrhaged to death apparently as the result of complications arising from a tonsillectomy performed by Dr. Sabado five days earlier. The plaintiff, Sandra Michael, filed suit and the case proceeded to trial on March 31, 1993. Following several days of trial, the jury rendered a verdict favoring the defendant. By order dated May 14, 1993, the trial court denied the plaintiff's motion for a new trial. The plaintiff appeals from

the final judgement and assigns numerous errors to this Court.[1]

The primary factual dispute in this case centers on the diagnosis leading to the tonsillectomy performed on Randi Michael. The plaintiff does not dispute that the tonsillectomy was properly performed. Instead, she claims that the defendant was negligent in his diagnosis of her daughter which led to the performance of an unnecessary tonsillectomy, and that Randi was released too early following the surgery.

The facts and events leading up to the tonsillectomy and death of Randi Michael are greatly disputed. The primary controversy is whether at the time of her tonsillectomy on November 16, 1988, the plaintiff's daughter suffered from symptomatology associated with infectious mononucleosis (not treatable by removal of tonsils), as is claimed by the plaintiff, as opposed to chronic tonsillitis (indicating a tonsillectomy).

On June 3, 1988, the defendant hospitalized Randi with a diagnosis of acute tonsillitis. The medical records indicate that this was the first medically diagnosed instance of tonsillitis. According to the plaintiff, the defendant decided that Randi needed a tonsillectomy based solely on this June, 1988, episode and without any prior documented instances of tonsillitis or throat infections. The plaintiff notes that when Randi arrived at City Hospital in Martinsburg by ambulance, Randi was in very serious condition, had severe difficulty swallowing, and her tonsils were infected. The tonsils were observed as being 4 +.[2]

The defendant examined Randi again at a follow-up appointment on June 16, 1988. He testified that at this appointment Randi's tonsils were enlarged, her neck showed swelling of the lymph nodes, and her ears were retracted. Further, he stated that it was at this examination, and not on June 3, that he informed the plaintiff that her daughter's condition required surgery. Based upon this advice, the plaintiff on June 29, 1988, signed the surgical consent form for Randi's surgery.

Randi's tonsillectomy originally was scheduled for August 3, 1988. However, upon arriving at the hospital on that date, the plaintiff was informed that her daughter's surgery had been postponed. The plaintiff claims that after the hospital representative was unable to explain why Randi's surgery had been postponed, she consulted with her family physician at the Tri–State Community Health Center. That doctor informed the plaintiff that Randi's surgery had been postponed due to an enlarged liver. However, the defendant claims that he spoke to the plaintiff and advised her of the abnormalities in Randi's lab work.

The plaintiff argues that the defendant based his treatment of Randi, including surgery, only on a history of sore throats and the June 3, 1988, tonsillitis incident and did not review any of Randi's medical records until ten days before trial, which was over four years after Randi's death. However, the defendant counters that the plaintiff downplays the interaction between himself and Randi's treating physicians at the Tri–State Community Health Center. Dr. Sabado admits that he did not review the medical records until trial; but, nonetheless, he maintains that he did have telephone conferences with the Tri–State Community Health Center concerning Randi's status.

The parties disagree over whether Randi's surgery was rescheduled during August,

---

1. The plaintiff assigned nine errors for this Court to review. We find three of the errors frivolous and lacking in merit. For that reason, we limit our review of the record to only six of her assignments. They are: (a) the adequacy of the *voir dire* examination; (b) the exclusion of rebuttal evidence; (c) the trial court's refusal to give an instruction on *punitive damages;* (d) the trial court's granting of an instruction over the plaintiff's objection; (e) the trial court's requiring a photograph to be reduced in size; and (f) the sufficiency of the evidence. We find no merit to plaintiff's argument that she was prejudiced by the trial court's allowing handwritten instructions to be viewed by the jury. There is no evidence in the record to show that the instructions were given to the jury. Also, the plaintiff alleges that the trial court committed reversible error by excluding newspaper articles and other hearsay evidence regarding her daughter's death. In addition to the evidence being incompetent, the same class of evidence was presented to the jury through the testimony of the plaintiff.

2. 4 + tonsils almost obstruct the throat.

1988, or on October 20, 1988, for a November 16, 1988, surgical date.[3] The plaintiff claims that the defendant did not perform any other examination or test on Randi during the five-month period to determine whether Randi's condition still necessitated surgery. Apparently, the defendant also failed to conduct any sort of investigation to discover why Randi's liver was enlarged.[4] The plaintiff asserts that Randi's medical records indicated tonsillitis. However, the defendant admitted in court that at the time he recommended the tonsillectomy in June, 1988, he also documented Randi as having no history of tonsillitis. At the time the defendant diagnosed Randi with tonsillitis, he did not order a test for mononucleosis.[5]

The plaintiff surmises that the defendant misdiagnosed her daughter, in part, because the defendant failed his ear, nose, and throat medical board examination six times that he could recall and that the defendant was never able to pass the oral portion of the test that dealt with rendering a diagnosis in patient scenarios.

At trial, the defendant's expert contended that "chronic" tonsillitis includes symptomatology that does not favorably respond to antibiotic treatment. The defendant admitted that Randi favorably responded to antibiotic treatment. However, the history and physical documents indicate that sore throat, tonsillitis with ear infections, reported historical sore throats, and tonsillitis with ear infections recurred in spite of antibiotic treatment. The defendant stated that he could not recall whether he examined Randi within thirty days prior to the surgery, as required by hospital rules; that his office records reflected no examination; and that Randi's "History and Physical" examination report must have been made by his assistant via a telephone conversation with Randi's mother.

The plaintiff's expert witness, Dr. Carl Cather, testified that Randi suffered from infectious mononucleosis instead of tonsillitis as diagnosed by the defendant. Dr. Cather also noted that the defendant's treatment of Randi was negligent because her medical history did not indicate the need for a tonsillectomy and that the defendant violated post-operative discharge procedures by releasing Randi four and one-half hours after surgery instead of waiting six to eight hours.[6] The early discharge is crucial under the plaintiff's theory because a clot may form during the first eight post-operative hours. The plaintiff claims that it is "vitally important to understand that Dr. Sabado should have required Randi to stay for the full 8 post operative hours." The defendant's expert, Dr. Richard Austin Wallace, completely rejected the argument that Randi was released too early from the hospital. Dr. Wallace testified that although the standard time for discharge for most patients is six to eight hours, clinical judgment determines the actual amount of time a patient needs to remain.

The plaintiff claims that as a result of the defendant's behavior Randi bled to death five days after surgery. The defendant points out that all the medical experts testified that hemorrhaging at the surgical site is a recognized risk of a tonsillectomy.

## II.

### JURY *VOIR DIRE*

The plaintiff first claims that "[t]he trial court abused its discretion and committed reversible error through its failure to conduct a meaningful and adequate jury voir dire and the error was compounded by the defendant capitalizing upon the lack of adequate *voir dire* during closing argument by offering inflammatory remarks regarding medical malpractice."

3. The plaintiff claims that the defendant rescheduled the surgery in August of 1988 for November 16, 1988. Dr. Sabado states that he did not reschedule the surgery until an October 20, 1988, office visit.

4. The plaintiff claims that an enlarged liver is a common symptom of mononucleosis.

5. Evidently, the Hancock Clinic records reflect that Randi came to the clinic on October 14, 1988, with swollen and inflamed tonsils and enlarged lymph glands.

6. It is suggested by the plaintiff that the defendant negligently discharged Randi early despite alleged post-operative complications because Randi was a "self-pay patient."

On the first day of trial, the plaintiff requested the opportunity for individual *voir dire*, or, in the alternative, the submission of a jury questionnaire. The trial court denied the plaintiff's pretrial motion for the questionnaire and individual *voir dire*. She contends that these measures were necessary to determine whether potential jurors may have a bias against medical malpractice suits. The plaintiff also asserts that the refusal to permit inquiry into potential bias prevented her from properly exercising her peremptory and for cause challenges. The trial court indicated that *voir dire* would be limited and specifically stated: "I will warn you, I cut more than I leave in on voir dire, just because it's my nature."

Additionally, the plaintiff argues that the defense counsel capitalized on the inadequate jury *voir dire* during closing argument. In referring to the defense's closing argument as "a deliberate effort to incite and inflame the minds of the jurors against the Plaintiff, and to appeal to their potential prejudices." [7] The plaintiff claims defense counsel made statements that medical malpractice suits were controversial and that plaintiff attorneys manipulate the court system and turn bad injuries or bad results into medical malpractice. She further contends that defense counsel referred to the case as "juicy" and argued that Randi's family physician lied in his trial deposition.[8]

The legal standard for *voir dire* is set forth in W.Va.Code, 56–6–12 (1923), which provides:

"Either party in any action or suit may, and the Court shall on motion of such party, examine on oath any person who is called as a juror therein, to know whether he is a qualified juror, or ... has any interest in the cause, or is sensible of any bias or prejudice therein[.]"

Furthermore, Rule 47 of the West Virginia Rules of Civil Procedure procedurally controls the *voir dire* examination of jurors by parties in a civil suit. Rule 47 reads, in part:

"(a) Examination of Jurors.—The court may permit the parties or their attorneys to conduct the examination of prospective jurors or may itself conduct the examination. In the latter event, the court shall permit the parties or their attorneys to supplement the examination by such further inquiry as it deems proper or shall itself submit to the prospective jurors such additional questions of the parties or their attorneys as it deems proper."

■ The process called *voir dire*, meaning "to speak the truth," is the litigants' opportunity to discovery whether there are any "relevant and material matters that might bear on possible disqualification of a juror." *Human Rights Comm. v. Tenpin Lounge, Inc.*, 158 W.Va. 349, 355, 211 S.E.2d 349, 353 (1975). In some cases, "a fair trial requires a meaningful and effective *voir dire* examination." *Human Rights Comm. v. Tenpin Lounge, Inc.*, 158 W.Va. at 355, 211 S.E.2d at 353. Because preconceived notions about the case at issue threaten impartiality, each juror must be free of bias.

■ The cases in this jurisdiction have long recognized that the official purposes of *voir dire* are to elicit information which will establish a basis for challenges for cause and to acquire information that will afford the parties an intelligent exercise of peremptory challenges. *See also* Syllabus Point 3, *Torrence v. Kusminsky*, 185 W.Va. 734, 408 S.E.2d 684 (1991) (jurors may be questioned not only for purposes of for cause challenges, but so that a party may intelligently use peremptory challenges). The means and methods that the trial judge uses to accomplish these purposes are within his discretion.

■ We review the adequacy of *voir dire* under an abuse of discretion standard. As stated in Syllabus Point 5, in part, of

---

7. At the conclusion of the defense's closing argument, the plaintiff approached the bench objecting and requested a cautionary instruction to the jury to disregard the remarks and moved to strike. The motions were denied over the plaintiff's objection.

8. The defendant denied the plaintiff's claim that he capitalized on inadequate jury *voir dire*. Furthermore, the defendant notes that the plaintiff should have made a motion *in limine* to limit any such comments if the plaintiff was truly concerned about the inadequacy of *voir dire*.

*State v. Derr*, 192 W.Va. 165, 451 S.E.2d 731 (1994),[9] this Court consistently has held:

" ' "[T]he inquiry made of a jury on its *voir dire* is within the sound discretion of the trial court and not subject to review, except when the discretion is clearly abused." Syl. pt. 2, *State v. Beacraft*, 126 W.Va. 895, 30 S.E.2d 541 (1944) [, *overruled on other grounds, State v. Dolin*, 176 W.Va. 688, 347 S.E.2d 208 (1986), *overruled on other grounds, State v. Edward Charles L.*, 183 W.Va. 641, 398 S.E.2d 123 (1990) ].' Syllabus Point 2, *State v. Mayle*, 178 W.Va. 26, 357 S.E.2d 219 (1987)."

However, there are limits to the trial court's discretion. A trial court may not limit *voir dire* to the extent that the very purpose of *voir dire* has been substantially undermined or frustrated. Thus, a trial court may abuse its discretion if it so limits the *voir dire* that the litigants are unable to determine whether the jurors are statutorily qualified or free from bias. *State v. Toney*, 171 W.Va. 725, 301 S.E.2d 815 (1983).

A "meaningful and effective voir dire examination" does not always mean that the trial court is required to permit counsel, or for the trial court itself, to question jurors individually or to submit questionnaires to the jury, as desired by the plaintiff, in every case. Unless compelled to the contrary by the United States or the West Virginia Constitution, we give great deference to the trial court's determination on the method of *voir dire*, believing that the trial court has a better feel and sense than an appellate court for the need to individually question the prospective jurors. Thus, to overturn a trial court's decision regarding the method of questioning prospective jurors, a complaining party must demonstrate to us that he or she has been specifically prejudiced.

To establish the fact-specific prejudice necessary to overturn the trial court's ruling, the plaintiff, rather than inviting this Court's attention to peculiar or unusual facts, places her primary reliance on *State v. Finley*, 177 W.Va. 554, 355 S.E.2d 47 (1987). Quoting from *Finley*, the plaintiff argues this Court stated that during *voir dire*, "a prospective juror need not affirmatively indicate bias or prejudice in order to require the trial court or counsel to conduct a more extensive examination on *voir dire*." 177 W.Va. at 557, 355 S.E.2d at 50. We believe that the plaintiff's reliance on *Finley* is misplaced.

In *Finley*, this Court reversed the defendant's conviction for marijuana manufacturing because the trial court's elicitation of damaging information from a potential juror coupled with the comments of another juror created a chance of bias or prejudice. The plaintiff cites *Finley* to support her argument that the jurors should have been subjected to individual *voir dire* or required to respond to a questionnaire. At times, a trial court may have to inquire into specific matters to ensure that a juror does not have bias in a particular area, even if the juror has not specifically articulated this bias. *State v. Finley*, 177 W.Va. at 557, 355 S.E.2d at 50.[10] As do some of our other cases, *Finley* supports the notion that unusual circumstances may require individual *voir dire* of prospective jurors to ensure that each juror is free of bias and prejudice.

However, the plaintiff in this case has not met the threshold necessary to require individual *voir dire*. The jurors in *Finley* were exposed to outside information about the defendant based upon what two other prospective jurors said during *voir*

---

**9.** *See also* Syl. pt. 3, in part, *Torrence v. Kusminsky, supra* (" ' " '[t]he nature and extent of the examination, however, should be left largely to the discretion of the trial court.' *State v. Stonestreet*, Point 1 Syllabus, 112 W.Va. 668 [166 S.E. 378 (1932) ]." Syl. pt. 4, *Henthorn v. Long*, 146 W.Va. 636, 122 S.E.2d 186 (1961).' Syllabus Point 1, *McCroskey v. Proctor*, 175 W.Va. 345, 332 S.E.2d 646 (1985)"); *Farley v. Farley*, 136 W.Va. 598, 68 S.E.2d 353 (1951); *Thornton v. CAMC*, 172 W.Va. 360, 305 S.E.2d 316 (1983).

**10.** However, when a juror does indicate possible prejudice or bias on *voir dire*, the juror should be questioned individually or excused. *See* Syllabus Point 1, *State v. Richards*, 182 W.Va. 664, 391 S.E.2d 354 (1990); Syllabus Point 5, *State v. Beckett*, 172 W.Va. 817, 310 S.E.2d 883 (1983); Syllabus Point 3, *State v. Pratt*, 161 W.Va. 530, 244 S.E.2d 227 (1978). In the present case, the trial court stopped and individually questioned every juror who responded to any of the *voir dire* questions.

*dire.*[11] The plaintiff does not present similar circumstances. She has not brought to this Court's attention nor have we found one scintilla of evidence in the record suggesting that the jurors in this case heard or made any comments concerning the parties or the nature or type of lawsuit involved here. Furthermore, the plaintiff accepted the entire panel of jurors without objection following *voir dire.* The mere fact that medical malpractice suits are controversial is not enough to justify a finding of abuse of discretion and thereby require the creation of a *per se* rule which would effectively require individual *voir dire* in all medical malpractice cases, even when there is no specific prejudicial information, act, or comment to which the jurors may have been exposed.

In denying the plaintiff's request for broader and more extensive *voir dire,* the trial court concluded that general questions in open court were sufficient to guarantee a fair trial. On the record before us, there is nothing to indicate that the trial court abused its discretion in refusing the plaintiff's request for individual *voir dire* or juror questionnaires.[12] Finding no error concerning the method of *voir dire,* we are unable to conclude that the error was then made prejudicial by the closing argument of defense counsel.

## III.

### REBUTTAL TESTIMONY

In her second assignment of error, the plaintiff argues that the trial court abused its discretion by excluding the rebuttal testimony of Janice Butts, a nurse at City Hospital, Inc., and erred by limiting the rebuttal testimony of Dr. William Cox, plaintiff's expert forensic pathologist, and the plaintiff.

At the end of the defendant's case, the trial court indicated it would hold the plaintiff's presentation of rebuttal testimony to a strict time limit. The plaintiff argues that this restriction was not justified, and the exclusion of this testimony was prejudicial.

The trial court also refused to allow the plaintiff's expert witness, Dr. Cox, to rebut the testimony of the defendant's expert witness. Dr. Cox was prepared to testify about the condition of Randi's tonsils and her cause of death. The plaintiff argues that it was not only prejudicial error to refuse to admit Dr. Cox's testimony, but that this error was exacerbated by the defendant's closing statement. We will discuss each of the rebuttal witnesses separately.

### A.

### *Janice Butts*

Janice Butts was prepared to testify that, contrary to what the defendant had testified, he did not cancel Randi's surgery in August; but it was the hospital who called and informed the defendant that the surgery was canceled because of Randi's abnormal liver function. Presumably, Ms. Butts's testimony was offered to challenge the credibility of the defendant. The trial court refused to allow Ms. Butts to testify out of fear that it would open "up a great big can of worms" and "confuse the heck out of the jury." The plaintiff argues that Ms. Butts's testimony was properly offered for impeachment purposes and that the defendant cannot claim unfair surprise just because Ms. Butts was not listed on any of the witness lists. Furthermore, the plaintiff claims she hoped she would not have to use Ms. Butts's testimony; but, nevertheless, she is not required to re-

**11.** In *Finley,* 177 W.Va. at 557, 355 S.E.2d at 50, we stated:

"The process to select jurors should endeavor to secure jurors who are not only free from prejudice, but who are also free from the suspicion of prejudice. *State v. West,* 157 W.Va. 209, 219, 200 S.E.2d 859, 865–66 (1973); *State v. Siers,* 103 W.Va. 30, 33, 136 S.E. 503, 504 (1927)."

**12.** The defendant argues there was sufficient *voir dire.* In fact, the trial judge granted a total of 28 of the plaintiff's proposed *voir dire* questions, nine of which were modified. The remaining 21 questions of the plaintiff were either withdrawn or denied. The trial judge granted seven of the defendant's *voir dire* questions, while seven were withdrawn and two were denied. Although the sheer number of questions allowed is not necessarily indicative of the adequacy of the questioning, it does appear that the trial court's overall effort was sufficient to determine bias.

veal every strategy she may need in court.[13] We must decide whether the testimony was proper rebuttal and was otherwise admissible under our evidentiary rules.

We recently discussed the proper standards to be used in determining rebuttal evidence requests. *Wheeler v. Murphy,* 192 W.Va. 325, 452 S.E.2d 416 (1994). In this opinion, we reaffirm our commitment to those principles expressed in *Wheeler.* In this case, the plaintiff argues that the rebuttal testimony was admissible to contradict the defendant who testified as to when, how, and why Randi's surgery, as initially scheduled, was cancelled. The trial court seems to have been concerned with the collateral nature of the rebuttal evidence and the evidence's potential for causing confusion.

The admissibility of rebuttal evidence is controlled by Rule 611(a) of the West Virginia Rules of Evidence, which provides:

"Control by Court.—The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment."

 Under the plain language of Rule 611(a) and our prior decisions, a trial court has discretion in allowing rebuttal testimony after a party rests its case. *State v. Oldaker,* 172 W.Va. 258, 304 S.E.2d 843 (1983). Thus, we review the trial court's determinations on rebuttal evidence under an abuse of discretion standard.

 We believe that the trial court did not abuse its discretion in excluding the evidence. Prior to the adoption of the West Virginia Rules of Evidence, it was a universal rule that a party could not use extrinsic evidence to contradict a witness on a collateral issue. *State v. Simmons,* 148 W.Va. 340,

135 S.E.2d 252 (1964). Although this rule was not specifically codified as part of the Rules of Evidence, most commentators suggest that the same result reached under common law should be obtained by a fair application of Rules 401 through 403. Professor McCormick suggests:

"The application of the standard theory of collateral contradiction discussed in this section has been criticized for use under the Federal Rules of Evidence on the ground that the result is a mechanically applied doctrine without consideration of properly pertinent matters. It has been urged that the discretionary approach of Rule 403 should be substituted.... [Basically,] Federal Rules of Evidence 401–403, which govern impeachment by contradiction, are entirely consistent with the 'collateral' doctrine as discussed in this section; Rule 403 is explicit in the discretion granted the trial judge to admit or exclude contradictions found relevant under Rule 401."

1 John William Strong, *McCormick on Evidence* § 49 at 187 (1992). (Footnotes omitted). We find the reasoning of Professor McCormick to be persuasive. Rule 403 is explicit in the discretion granted a trial judge to admit or exclude contradictions found to be "relevant"[14] under Rule 401. Many of the evils that Rule 403 is designed to avoid are similar to those sought to be avoided by the exclusion of extrinsic evidence on a collateral matter to impeach credibility. These evils include confusion of the issues, misleading the jury, undue delay, and waste of time. 1 Franklin D. Cleckley, *Handbook on Evidence for West Virginia Lawyers,* § 6–9(B)(2)(a) at 737–38 (3rd ed. 1994).

 Guided by these principles, we now apply Rules 401 through 403 to the facts of this case. First, we find that the rebuttal testimony of Ms. Butts was collateral and only would have been relevant as impeachment evidence. Second, although no longer

---

13. The plaintiff acknowledges that some of her questions to Dr. Cox were not in the proper form for rebuttal. Furthermore, the plaintiff's explanation as to why Ms. Butts was not called during her case-in-chief and not listed on any witness lists seems weak.

14. Although it is collateral in the sense of the "collateral evidence" rule, we find that impeachment and contradiction evidence is also "relevant" for Rule 402 purposes. Were it not so; no impeachment evidence would be admissible.

dispositive under Rule 402, we note that the rebuttal evidence was in the form of extrinsic evidence.[15] Third, the trial court did not abuse its discretion in excluding the evidence under Rule 403 considering its potential to confuse the issues and waste time. Although not expressed with the clarity or eloquence of a Felix Frankfurter, the trial court applied Rule 403 when it said this rebuttal evidence would open "up a great big can of worms" and "confuse the heck out of the jury." Thus, we find no error in excluding the testimony of Janice Butts.

### B.

### Sandra Michael

The plaintiff was recalled to testify as a rebuttal witness. She claims that the trial judge erroneously excluded her rebuttal testimony. Specifically, the plaintiff contends that she was not allowed to testify to the fact that none of the physicians (Dr. Anderson, Dr. Shaffin, Dr. Eyunni, Dr. Kettl, and Dr. Greenspoon) told her that a tonsillectomy was appropriate for Randi. She also wanted to testify that she relied solely and exclusively upon the diagnosis and judgment of the defendant and that he never told her he was seeking the opinion of other physicians.

To evaluate this assignment of error, it is necessary to review most of the designated record. First, we do not find anything in the record to indicate that Dr. Anderson and Dr. Shaffin suggested, agreed to, or had any feelings about the tonsillectomy. As for Dr. Eyunni, the defendant stated that he did not speak to Dr. Eyunni "on the record" about the medical procedure; but the defendant did suggest it was his practice to discuss his procedures and patients with Dr. Eyunni.

Second, the defendant stated a number of times that Dr. Kettl had agreed to the surgery or that Dr. Kettl had told him to proceed with the surgery. Again, there was no record evidence showing the plaintiff was told by Dr. Kettl that she should allow the defendant to perform the surgical procedure. In fact, the testimony of the defendant indicated that he spoke directly to Dr. Kettl about Randi and that Dr. Kettl made notations on the medical forms approving the surgery.

During his deposition, the defendant testified that Dr. Greenspoon recommended that Randi have a tonsillectomy. However, at trial, the defendant admitted he was unsure whether he was actually referring to Dr. Greenspoon, Dr. Kettl, or some other individual. On cross-examination, the plaintiff admitted that Dr. Greenspoon told her to go ahead with the surgery. However, Dr. Greenspoon's deposition testimony conflicts with both the plaintiff's and the defendant's in that Dr. Greenspoon stated he did not tell anyone he recommended the tonsillectomy.

We find, however, that none of the proposed testimony of the plaintiff concerning the other doctors and their feelings regarding surgery is true rebuttal evidence because neither the defendant nor any of his witnesses testified about what the other doctors supposedly told the plaintiff. The only area that the plaintiff might have been able to address was the defendant's confusion concerning whether Dr. Greenspoon gave the defendant approval as to the surgery.[16] The difficulty here is that the plaintiff testified Dr. Greenspoon told her to reschedule the surgery and Dr. Greenspoon's deposition indicated that he had not said anything about the tonsillectomy. Thus, the trial court was justified in denying the testimony as proposed regarding the doctors. We agree with the trial court's observation that if this class of evidence is admissible, the plaintiff should have called the doctors themselves to testify that they did not approve or suggest the tonsillectomy. Furthermore, the plaintiff's contentions that she was not allowed to testi-

---

15. We might review this assignment of error differently if these same facts were attempted to be elicited or established on cross-examination. In other words, it would have been perfectly proper for these same facts to have been brought out on cross-examination of the witness to be contradicted.

16. Rebuttal evidence is more than evidence that simply contradicts the opposing and corroborates the proffering party, but it is also "evidence of denial of some affirmative fact which the answering party has endeavored to prove." 1 Franklin D. Cleckley, *Handbook on Evidence for*

fy that she relied totally on the defendant's diagnosis and that the defendant never told her that he sought other opinions are completely irrelevant for rebuttal purposes.

Next, the plaintiff contends she was not allowed to testify that the defendant did not tell her to go to the Tri–State Clinic in Hancock, Maryland. The defendant did testify that after the cancellation of the tonsillectomy the first time, he told the plaintiff to return to the clinic. While we agree with the plaintiff that her testimony concerning returning to the Tri–State Clinic is rebuttal evidence, plaintiff's counsel did, in fact, elicit testimony from the plaintiff that the defendant was not telling the truth about sending her back to the clinic. Critically, however, plaintiff's counsel did not pursue this line of questioning.[17] Neither the court nor defense counsel objected to this line of questioning once plaintiff's counsel asked the questions in proper rebuttal format.

The third area the plaintiff claims she wanted to pursue on rebuttal involved whether she told any of the physicians that Randi had repeated sore throats. The defendant and his expert, Dr. Wallace, testified the plaintiff informed the defendant that Randi had suffered other sore throats. Here, again, there appears to be a case for true rebuttal evidence. The record does support the plaintiff's contention that the defense claimed she told Dr. Sabado about other sore throats. The plaintiff's counsel asked the plaintiff: "Did you ever tell any doctor who saw Randi between—strike that. Did you ever tell any doctor that your daughter had had repeated sore throats?" The defense then objected to this question, arguing this

was improper rebuttal. The plaintiff withdrew the question without ever allowing the trial court to rule on the objection. The plaintiff's counsel then asked the plaintiff whether she told the defendant her daughter had sore throats. The plaintiff stated no. Plaintiff's counsel did not ask any other questions about the sore throats. We find no evidence that the trial court tried to stop the plaintiff from pursuing this line of questioning. Again, as above, the plaintiff voluntarily failed to pursue a viable line of questioning.

## C.

### Dr. William Cox

The final rebuttal witness for the plaintiff was Dr. William Cox, a forensic pathology expert. The plaintiff contends she was prevented from rebutting the testimony of the defendant's expert, Dr. Wallace. The plaintiff contends that "Dr. Wallace ... testified on direct examination that: (1) Randi was suffering from chronic tonsillitis; and (2) Randi's tonsils were 'markedly hypertrophied.'" The record indicates that Dr. Cox did testify as to several matters, but was prevented from testifying as to other facts because the trial court sustained objections to the form of the questions and to another question that was improper rebuttal. The plaintiff claims that if the trial court had not excluded this testimony, Dr. Cox would have given his opinion that Randi's tonsils were consistent with an acute episode of tonsil infection one month prior to their removal and that Randi did not suffer from chronic tonsillitis. Similarly, the plaintiff argues that Dr. Cox would have concluded that Randi

---

*West Virginia Lawyers* § 6–11(D)(3) at 777 (1994).

**17.** During rebuttal, the following exchange took place:

"[Plaintiff's Attorney:] And then there's the issue of when you took your daughter to see Dr. Greenspoon at the Tri-state Clinic in October of 1988. You testified she had a sore throat and that's why you took her, correct?

"[Plaintiff:] Yes.

"[Plaintiff's Attorney:] When you saw Dr. Greenspoon did you go because Dr. Sabado sent you there or did you go for some other reason?

"[Defendant's Attorney:] Objection.

"THE COURT: You have heard the testimony of Dr. Sabado, he says he sent you there, is

that true or not, that is rebuttal. You are going through direct examination again and I'm going to cut it off in a minute your.

"[Plaintiff's Attorney:] All right then, I'll ask it another way. Did you hear Dr. Sabado say that he sent you with your daughter to the Tri-state Community Clinic in Hancock? Did you hear him say that?

"[Plaintiff:] Yes.

"[Plaintiff's Attorney:] Is it true?

"[Plaintiff:] No, it's not.

"THE COURT: That's rebuttal.

"[Plaintiff's Attorney:] I don't have any further questions.

"THE COURT: Is that the end of rebuttal?

"[Plaintiff's Attorney:] That's the end of rebuttal, Your Honor."

died from cardiovascularitis due to hypovolemic shock and that she lost a lot of blood due to hemorrhaging from the tonsillectomy site.[18] Because there is a substantial difference between the plaintiff and the defendant as to what happened below, a review of the trial transcript is necessary:

"[Plaintiff's Attorney:] Dr. Cox, based upon your education, experience, and training, and based on your review of the medical records including the slides, the pathology slides that Randi Michael tonsils, do you have an opinion to a reasonable degree of medical certainty as to whether or not Randi Michael suffered from chronic tonsillitis?

"THE COURT: Sustained.

"[Plaintiff's Attorney:] Dr. Cox, based upon your records including the slides have you formed an opinion as to whether or not—and based upon your education, training, and experience and to a reasonable degree of medical certainty have you formed an opinion as to the size of Randi Michael's tonsils at death?

"[Plaintiff's Expert:] Yes, I have.

"[Plaintiff's Attorney:] C e r v i x excuse me.

"[Plaintiff's Expert:] I understand.

"[Plaintiff's Attorney:] What's your opinion?

"[Plaintiff's Expert:] My opinion is that they were within normal size that you would expect for a child within this age group.

"[Plaintiff's Attorney:] Based upon your education, training, and experience and your review of the autopsy and slides as to a reasonable degree of medical certainty did Randi Michael show any evidence of enlarged lymphnodes at autopsy?

18. We note a marked improvement as to what Dr. Cox would have testified to between the trial proffer and what appeared in the plaintiff's appellate brief. For example, the plaintiff in her brief claims that Dr. Cox would have testified that Randi died from cardiovascularitis due to hypovolemic shock and that she lost a lot of blood due to hemorrhaging from the tonsillectomy site. The plaintiff never suggested these facts in her voucher. The voucher reads as follows:

"MR. LINDSAY: Plaintiff's counsel, the person Richard Lindsay, was prevented from asking questions of the plaintiff's rebuttal witness, Dr. William Cox regarding the condition of the tonsils at the time of Randi Michael's surgery. Plaintiff's expected testimony from Dr. Cox would have been—it would have been admitted that Dr. Cox, to a reasonable degree of medical certainty, would have stated that Randi Michael's tonsils showed no evidence of chronic infection, that would have lasted three months or longer.

"Second, plaintiff's counsel Richard Lindsay was prevented by the court from asking of Dr. Cox what the surgical and of Randi Michael tonsils would have appeared like if Randi Michael would have had an acute tonsil infection approximately one month prior to their removal. Plaintiff's expert, Dr. Cox, expected testimony would have been that Randi Michael's tonsils when they were removed and read by the pathologist were consistent with an acute episode of tonsil infection approximately one month prior to their removal.

"Plaintiff's counsel, Richard D. Lindsay, was prevented from asking the plaintiff's expert, Dr. Williams Cox, what the lack of enlarged lymphnodes on the autopsy would have indicated to Dr. Cox and plaintiff expert's expected testimony would have been that the lack of enlarged lymphnodes at autopsy would have indicated to him that Randi Michael did not suffer from chronic lymphnode enlargement infection or chronic tonsillitis.

"All questions above by Richard D. Lindsay were objected to by defense counsel and the objections of the defense counsel were sustained over our objection. Thank you."

We remind the lower court and the opposing parties that they have a role to play that is vital to the vouching process. A trial judge has discretion both under Rule 611(a) and Rule 103(b) of the West Virginia Rules of Evidence to require the offer of proof be made in the form of questions and answers of the witness whose testimony is excluded. Under Rule 103(b), "[t]he court may add any other or further statement which shows the character of the evidence, the form in which it was offered, the objection made, and the ruling thereon. It may direct the making of an offer *in question and answer form.*" (Emphasis added). *See also State v. Price,* 92 W.Va. 542, 115 S.E. 393 (1922) (court may allow "the witness to answer the question in absence of the jury, or by stating in the record the answer the witness is expected to make"). A trial court is not obligated to accept the form proposed by the side making the offer of proof. The preferable practice when dealing with expert witnesses is to require the witness to answer specific questions. Had that been done here, the confusion and conflict that we have identified would have been eliminated. Moreover, it would be helpful after the offer of proof has been made for the trial court to reconsider its ruling on the record. This action, at least, would give the trial court the last word on the issue.

"[Defendant's Attorney:] Your Honor, I must object again. He's not rebutting anything. He is giving his own firsthand opinions. If he's got something to rebut let him rebut.

"[Plaintiff's Attorney:] It's been testified—

"THE COURT: Not at the time of surgery. Come on over here and somebody tell me who did.

"(Counsel for both parties approach the bench.)

"(NOT AUDIBLE.)

"[Plaintiff's Attorney:] Dr. Lawrence (sic) was talking about it, Your Honor.

"THE COURT: He was talking about—

"[Plaintiff's Attorney:] He was talking about—

"THE COURT: This is not rebuttal.

"[Plaintiff's Attorney:] —our objection is on the record.

"THE COURT: Okay.

"[Plaintiff's Attorney:] No further questions."

■ There is no indication from the record that the question concerning what Randi's tonsils would have looked like if Randi had an acute tonsil infection one month prior to removal was ever presented to the trial court. Similarly, the plaintiff never attempted to ask what the lack of enlarged lymphnodes on the autopsy would indicate to Dr. Cox. We find that because the plaintiff voluntarily discontinued her examination of her rebuttal witness without specifically attempting to ask the two questions referred to above, the only error preserved is whether the trial court abused its discretion in excluding as improper rebuttal evidence the answer to the question: "Based upon your education, training, and experience and your review of the autopsy and slides as to a reasonable degree of medical certainty did Randi Michael show any evidence of enlarged lymphnodes at autopsy?"

■ The trial court apparently believed that the size of Randi's lymphnodes at the time of surgery was improper rebuttal. That was the reason for his comment: "Not at the time of surgery. Come on over here and somebody tell me who did." Not being satisfied with counsel's explanation, the trial court continued its ruling sustaining the objection after which plaintiff's counsel abruptly refused to discuss the issue further and stated "—our objection is on the record." After a thorough and careful review of the record, we agree with the trial court that the defense witnesses had not testified to the size of Randi's lymphnodes at the time of her surgery or death. The only evidence we find in the record is that the defendant himself made reference to the size of Randi's lymphnodes at the time of various hospital visits. In response to the trial judge's challenge to identify the witness claimed by plaintiff to have given testimony on this subject at the time of surgery or death, counsel for the plaintiff referred to a Dr. Lawrence. The reference to Dr. Lawrence is probably a mistake or counsel was mistaken in her belief that a Dr. Lawrence had addressed this subject. Either way the record does not support the plaintiff's contention.

■ We find the trial court did not abuse its discretion under Rule 611(a) in excluding this rebuttal evidence. Allowance of a party to present additional evidence on rebuttal depends upon the circumstances of the case and rests within the discretion of the individual most able to weigh the competing circumstances—the trial judge. *See Belcher v. CAMC*, 188 W.Va. 105, 422 S.E.2d 827 (1992) (finding no error when court refused to allow testimony of plaintiff's rebuttal witnesses when allowing the testimony would have amounted to an attempt to reopen the case). We also observe that "the trial court's discretion is especially broad in the situation where the plaintiff's proffered rebuttal evidence is such that it could *and should have* been part of its case-in-chief." *Belcher v. CAMC*, 188 W.Va. at 109, 422 S.E.2d at 831. (Emphasis in original). *See Edmiston v. Wilson*, 146 W.Va. 511, 120 S.E.2d 491 (1961).

## IV.

### JURY INSTRUCTIONS

The plaintiff cites numerous assignments of error in relation to jury instructions, but we find that only two merit discussion. We

will discuss below the plaintiff's contentions that Defendant's Instruction No. 9 was erroneously given over her objection and that her instruction on punitive damages was incorrectly refused.

### A.

### *Defendant's Instruction No. 9*

The plaintiff argues that Defendant's Instruction No. 9 was improperly admitted over her objection. Defendant's Instruction No. 9, as amended, concerned the standard of care and causation of the injury claimed that may be beyond the knowledge of the reasonable person.[19] Defendant's Instruction No. 9 was based on W.Va.Code, 55–7B–7 (1986), and this Court's decision in *Torrence v. Kusminsky, supra.* The plaintiff argues that the instruction was improper because it misled the jury to believe that causation is a subject outside their understanding that must be established by expert testimony.

 Defendant's Instruction 9 does mention that the "standard of medical care and causation of the injury claimed is beyond the knowledge of the average lay person." However, the next line of the instruction states: "Therefore, the law requires that expert medical testimony be presented to establish the standard of care to be exercised by physicians." There is nothing in this instruction that specifically states that expert testimony is required to prove causation; but, the language "causation of the injury is beyond the knowledge of the average layperson" could cause a jury to misunderstand its duty to find causation in a case. The plaintiff has not convinced us that there is a real possibility that the jury was greatly swayed or even would have given disproportionate consideration to the aforementioned clause of

this instruction. The instruction is firmly grounded in law and the questionable sections do not eradicate the legal basis for this instruction.[20] Admittedly, if viewed separately from the entire jury charge, there is a slight possibility that the jury upon hearing this instruction did not fully understand its duties. However, the potential prejudice of this instruction must be examined in light of the entire jury charge and the other instructions given at trial. We said in Syllabus Point 3 of *Lenox v. McCauley*, 188 W.Va. 203, 423 S.E.2d 606 (1992):

> " ' "Instructions must be read as a whole, and if, when so read, it is apparent they could not have misled the jury, the verdict will not be distrubed, through [sic] one of said instructions which is not a binding instruction may have been susceptible of a doubtful construction while standing alone." Syl.Pt. 3, *Lambert v. Great Atlantic & Pacific Tea Company*, 155 W.Va. 397, 184 S.E.2d 118 (1971).' Syllabus Point 2, *Roberts v. Stevens Clinic Hospital, Inc.*, 176 W.Va. 492, 345 S.E.2d 791 (1986)."

*See also* Syllabus Point 1, *Donta v. Harper*, 168 W.Va. 237, 283 S.E.2d 921 (1981).

In this case, the other instructions given by the trial judge clearly informed the jury that it had the duty to determine whether the evidence presented established causation for the injury. Although the wording of Defendant's Instruction No. 9 may be somewhat confusing, it is an accurate statement of the law. Therefore, we find that considering the instructions as a whole, the trial court did not err in giving Defendant's Instruction No. 9 to the jury.

---

19. Defendant's Instruction No. 9, as amended, states:

"The Court instructs the jury that in cases involving allegations of medical malpractice, the law recognizes that the complexity of the human body and medical science places questions as to the standard of medical care and causation of the injury claimed beyond the knowledge of the average lay person. Therefore, the law requires that expert medical testimony be presented to establish the standard of care to be exercised by physicians. If you find,

from a preponderance of the evidence, that credible evidence does not exist to establish malpractice, then your verdict should be in favor of Dr. Sabado."

20. W.Va.Code, 55–7B–7, requires that "[t]he applicable standard of care and a defendant's failure to meet said standard, if at issue, shall be established in medical professional liability cases by the plaintiff by testimony of one or more knowledgeable, competent expert witnesses if required by the court."

## B.

### Plaintiff's Punitive Damage Instruction

The plaintiff claims there is sufficient evidence to find the defendant acted with criminal indifference. Therefore, a punitive damage instruction was appropriate. On the other hand, the defendant claims that his actions in not being Board certified do not constitute "wanton, willful, [or] reckless ... criminal indifference."

 The plaintiff cites *Muzelak v. King Chevrolet*, 179 W.Va. 340, 368 S.E.2d 710 (1988), and *TXO Production v. Alliance Resources*, 187 W.Va. 457, 419 S.E.2d 870 (1992), *aff'd*, —— U.S. ——, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993), in defense of her argument that the punitive damage instruction was erroneously denied. However, neither of the cases supports the plaintiff's contentions. In both of the aforementioned cases, the evidence presented was clear cut. The plaintiffs in these two cases were able to convincingly prove definite misrepresentations by the respective defendants. Here, because the trial court did not think the evidence presented warranted such an instruction and out of fear the instruction as written would inflame the jury, it refused to give the punitive damage instruction. We agree with the trial court. In West Virginia, it is not error to refuse a proposed instruction not supported by the evidence. *See generally State v. Gum*, 172 W.Va. 534, 309 S.E.2d 32 (1983).

 Punitive damage instructions are legitimate only where there is evidence that a defendant acted with "'wanton, willful, or reckless conduct or criminal indifference to civil obligations affecting the rights of others to appear'" or where the legislature so authorizes. Syllabus Point 3, in part, *Muzelak v. King Chevrolet, supra, quoting* Syllabus Point 9, *Cook v. Heck's, Inc.*, 176 W.Va. 368, 342 S.E.2d 453 (1986). *See also TXO Production v. Alliance Resources*, 187 W.Va. at 473, 419 S.E.2d at 887. We find no such evidence in this case.[21]

**21.** Even if we found error in this case, it would not be reversible simply because the plaintiff did not prevail on the issue of liability. Without a

## V.

### PHOTOGRAPHS OF RANDI MICHAEL

The plaintiff next claims that the trial court erred when it granted, over her objection and in the face of plaintiff's trial memorandum, the defendant's motion to reduce the size of one of four photographs of Randi.

 The trial court granted the defendant's motion to reduce the size of a 16–by–20 inch photograph of Randi. The plaintiff claims that the reduction in size was unwarranted because the size of the original photograph was insufficient to inflame the jury under West Virginia law. Already, we have suggested that the trial court under Rule 611(a) of the West Virginia Rules of Evidence has broad discretion to determine the method by which evidence is presented to the jury. The plaintiff does not offer any evidence that she was prejudiced by the reduction of the photograph, and we can find none. *Pasquale v. Ohio Power Company*, 187 W.Va. 292, 418 S.E.2d 738 (1992). Thus, we find no error sufficient to justify reversal.

## VI.

### VERDICT CONTRARY TO THE EVIDENCE

In the plaintiff's final assignment of error, she contends that "the verdict for the defendant was contrary to the preponderance of the evidence and clearly wrong, and should therefore be reversed."

 In *South Side Lumber Co. v. Stone Construction Co.*, 151 W.Va. 439, 447, 152 S.E.2d 721, 725 (1967), this Court held that "[a] judgment or decree which is plainly wrong or is without evidence to support it will be reversed and set aside on appeal." *See also Boggs v. Settle*, 150 W.Va. 330, 145 S.E.2d 446 (1965); *Lewis v. Dils Motor Co.*, 148 W.Va. 515, 521, 135 S.E.2d 597, 600 (1964) ("[t]his Court cannot disturb a finding of fact made by a trial court unless it is clearly wrong"); *Gray v. Marino*, 138 W.Va. 585, 76 S.E.2d 585 (1953). Our task on appeal is to determine only whether the evidence was such that a reasonable trier of fact

finding of liability by the jury, damages become irrelevant.

might have reached the same decision below. *See Mildred L.M. v. John O.F.,* 192 W.Va. 345, 452 S.E.2d 436 (1994). We find that the evidence supported the verdict.

 The plaintiff argues that the preponderance of the evidence does not support a judgment for the defendant. In support of this contention, the plaintiff argues that the judgement is clearly wrong because there was sufficient medical evidence that defendant's actions fell below the standard of care. Furthermore, the plaintiff states that all Randi's medical records show that Randi's condition never met the criteria for "chronic tonsillitis." The plaintiff also notes that the defendant failed his ENT board examination six times; he did not follow proper hospital procedures for submitting a "History and Physical" report; he never ordered any tests to see why Randi's liver was enlarged; and he did not examine Randi's complete medical records until a few days before trial.

The defendant does not address this error in his brief; and, although the plaintiff's list of accusations are serious, a review of the record clearly indicates there was sufficient evidence to justify the jury's verdict. The jury alone is empowered to resolve the factual disputes presented in this case. There was a substantial conflict between the medical experts. When such a conflict exists, an appellate court lacks authority to reverse absent some clear error. Furthermore, if the defendant actually maintained close contact with Randi's other treating physicians, as he claimed, the fact that he failed to completely review her medical records may be unimportant. This, again, was a proper issue for the jury to resolve. Additionally, while the assertion that the defendant failed his Board examination several times created a credibility issue, it did not render the defendant incompetent as a matter of law or otherwise indicate a complete lack of medical skill.

## VII.

## CONCLUSION

Finding no reversible error in this case, the judgment of the Circuit Court of Berkeley County is affirmed.

Affirmed.

BROTHERTON, J., did not participate.

MILLER, Retired Justice, sitting by temporary assignment.