696 S.E.2d 38

**STATE of West Virginia, Plaintiff Below, Appellee**

v.

**Christopher Shane DELLINGER, Defendant Below, Appellant.**

No. 35273.

Supreme Court of Appeals of West Virginia.

Submitted April 14, 2010.

Decided June 3, 2010.

Barbara A. Harmon–Schamberger, Schamberger Legal Services, Clay, WV, for Appellant.

Robert D. Goldberg, Attorney General's Office, Charleston, WV, for Appellee.

PER CURIAM:

Appellant Christopher Shane Dellinger was convicted by a jury in the Circuit Court

of Braxton County, on February 15, 2008, of three counts of Falsifying Accounts and one count of Obtaining Money, Goods, Services or Property by Fraudulent Pretenses Using a Common Scheme, all felonies. In this appeal, we address Appellant's contention that a juror's complete lack of candor during *voir dire* regarding her connections to Appellant and several named witnesses resulted in a violation of Appellant's constitutional right to trial by a fair and impartial jury.

Upon careful consideration of the petition for appeal, the briefs and argument of counsel and the applicable legal authority, and for the reasons discussed below, we reverse Appellant's conviction and remand this case for a new trial.

I. Factual and Procedural Background

At all times relevant, Appellant was employed as a Braxton County Deputy Sheriff and, in that capacity, was responsible for applying for and administering various grants for the benefit of the Braxton County Sheriff's Department. At issue below was whether Appellant violated the terms of three particular grants which were awarded to the Braxton County Commission by the West Virginia Commission on Drunk Driving Prevention for the purpose of funding equipment *or hiring additional personnel to aid in* the enforcement of drunk driving laws. According to the State, the evidence at trial demonstrated that Appellant claimed credit for hours he had not worked and for time he spent on administrative duties (such as paperwork) related to the grants. With regard to the latter, the State argued that the grant requirements restricted payment of expenditures to activities directly related to drunk driving prevention and thus, did not provide for payment for administrative work.

The case was tried before a jury, which convicted Appellant of three of the six counts of Falsifying Accounts for which he was indicted, and of one count of Obtaining Money, Goods, Services or Property by Fraudulent Pretenses Using a Common Scheme.[1] Immediately following the verdict, Appellant's

1. Appellant was sentenced to one to ten years for each count, with the sentences to run consecutively and with credit for time served. The court further *suspended the period of incarceration* and ordered Appellant placed on home confinement for a period of two years followed by probation for a period of five years.

trial counsel informed the court of possible juror misconduct,[2] an allegation which the court ordered to be investigated and which will be discussed in more detail herein. On May 5, 2008, Appellant filed a written motion for new trial based on juror misconduct and a hearing thereon was conducted on June 11, 2008.[3]

### Allegation of Juror Misconduct

At the direction of the trial judge, an investigation into alleged juror misconduct was conducted concerning Juror Amber Hyre. During the course of the investigation and at the June 11, 2008, hearing, it was learned that on February 7, 2008, approximately one week before Appellant's trial began, Juror Hyre [4] sent a message to Appellant on "www. MySpace.com," a social networking website. In that message, Juror Hyre, known as "Amber," wrote to Appellant:

> Hey, I dont know you very well But I think you could use some advice! I havent been in your shoes for a long time but I can tell ya that God has a plan for you and your life. You might not understand why you are hurting right now but when you look back on it, it will make perfect sence. I know it is hard but just remember that God is perfect and has the most perfect plan for your life. Talk soon! [5]

(Footnote added) According to Juror Hyre, after she sent this message to Appellant, the two became MySpace "friends," which allowed Appellant to view postings on Juror Hyre's MySpace page and vice versa. It is undisputed that, during *voir dire*, when all of the prospective jurors were asked whether they had a business or social relationship with Appellant, Juror Hyre remained silent. For his part, Appellant avers that he did not then recognize Juror Hyre to be the same "Amber" who wrote to him on MySpace. Apparently, "Amber" from MySpace did not include her last name and, according to Appellant, Juror Hyre looked very different from her photograph posted on the website. As indicated above, Appellant alerted the trial court to Juror Hyre's MySpace message just following the verdict, having first learned that Juror Hyre and "Amber" were the same person only a short time earlier.[6]

It was also learned during the investigation that on February 13, 2008, during the course of the trial, Juror Hyre posted the following message on her MySpace page: "Amber Just got home from Court and getting ready to get James and Head to church! Then back to court in the morning!" She also described her "mood" as "blah." This message was not sent to any particular person but rather was available for viewing on Juror Hyre's MySpace page by all of her approximately 130 MySpace "friends," including Appellant.

According to the investigating officer's February 18, 2008, memorandum to the prosecuting attorney, "Mrs. Hyre was questioned about her friendship with Mr. Dellinger and she stated that she knew him and had spoke to him only to say 'hi' in passing and that

---

**2.** According to Appellant, he learned of the alleged misconduct while the jury was deliberating.

**3.** On May 5, 2008, Appellant filed an additional motion for new trial based on the State's alleged misuse of subpoenas. He filed a third motion for new trial on June 3, 2008, based on the State's alleged violation of Appellant's Fifth Amendment rights. A separate hearing on the issues raised in these two motions was conducted on August 11, 2008.

**4.** On this date, Juror Hyre had been summoned but had not yet appeared for jury duty.

**5.** Juror Hyre told investigators that she wrote the message because she heard Appellant was going through a divorce and wanted to provide him with some advice. However, according to Appel-

lant, he had been divorced for more than two years.

**6.** We note that, unlike Juror Hyre, Appellant's first and last names appeared on MySpace; identified him as a law enforcement officer; and indeed, included a photograph of him in his law enforcement uniform. Thus, we agree with Appellant's contention that Juror Hyre could not have reasonably failed to recognize Appellant as the defendant in the trial below.

Furthermore, according to Appellant, while the jury was deliberating, his counsel also became aware that a second juror, Theresa Lane, had failed to disclose that she had been the caregiver to the father of one of the witnesses. When Appellant asked the investigating officers to also look into this matter, they declined to do so because the court had ordered an investigation of Juror Hyre and no other.

they used to live in the same apartment complex together." It is undisputed that, during *voir dire*, Juror Hyre never indicated to the trial court that she knew Appellant; had ever spoken to him "in passing"; or that they used to live in the same apartment complex.[7]

At the June 11, 2008, hearing on the juror misconduct issue, Juror Hyre testified that although she and Appellant were MySpace "friends" the two had never had a face-to-face conversation and did not have a close, personal relationship. She testified that he was "[j]ust somebody I knew," and explained that "I knew him. I mean he's a cop in the county; everybody knows all the cops." When asked on direct examination why she did not respond to the *voir dire* question of whether she knew Appellant, she replied:

> Bad judgment, I guess. I just didn't feel like I really knew him. I didn't know him personally. I've never, never talked to him. And I just felt like, you know, when he asked if you knew him personally or if he ever came to your house or have you been to his house, we never did. So I just didn't feel like I really did know him.... That's why I didn't say anything.

On cross examination, Juror Hyre was asked whether she would have replied that she knew Appellant if given the opportunity to answer the question all over again. She replied:

> I believe that God was telling that I should've and disobeyed. So, yeah, I figure I probably would have said something just to keep my heart in the right place.... I mean, I wasn't—it didn't seem like it was very important, I mean, because I knew in my heart that I didn't know him. But I feel now, with all this going, maybe I should have at least said that, you know, that he was on MySpace, which really isn't that important, I didn't think.

Juror Hyre's complete lack of candor before the trial court was not limited to her relationship to Appellant. When she and the other prospective jurors were asked whether any of them are "related by blood or connected by marriage to or have any business or social relationship with any" of the witnesses named, Juror Hyre again remained silent. In so doing, she failed to disclose the fact that she is related by marriage to witness Theresa Frame, who testified in her capacity as a Braxton County Commissioner. Mrs. Frame's daughter, Kirk Frame, is Juror Hyre's sister-in-law and, indeed, it was also revealed that the two are close, personal friends. It is undisputed that Juror Hyre did not disclose her relationship "by marriage" to Mrs. Frame or her social ties to Mrs. Frame's daughter. At the June 11, 2008, hearing, Juror Hyre testified that she did not reveal this information because she does not "know" Mrs. Frame. Juror Hyre explained that "[t]hey asked 'if you know these people,' and I don't know her. I've never, ever to this day spoke to her."

It is also undisputed that, during *voir dire*, Juror Hyre did not advise the court that her brother-in-law worked for another witness, Brenda Slaughter, at Braxton County EMS. By way of explanation as to why she did not disclose this information, Juror Hyre testified that she knew of Mrs. Slaughter and the fact that her brother-in-law works for her, "but other than that I do not know her." Thus, Juror Hyre did not believe she was required to reveal this information.[8]

Upon questioning by the trial court at the June 11, 2008, hearing, Juror Hyre testified that her connection to Appellant and witnesses Frame and Slaughter had no effect on her ability to impartially consider the evidence at trial.

By order entered August 11, 2008, the trial court denied Appellant's motion for new trial finding, *inter alia*, that Juror Hyre's "contact with [Appellant] was minimal, and she was a fair and impartial juror." The court further

---

**7.** It is unclear from the record whether Appellant was previously aware that he and Juror Hyre formerly lived in the same apartment complex.

**8.** Appellant also argues that Juror Hyre did not disclose to the trial court the fact that she attends the same church as witness John Bonazzo. A careful review of her testimony at the June 11, 2008, hearing reveals that she did not become aware they were members of the same church until *after* Appellant's trial.

found that Juror Hyre "acknowledged that she knew of the [Appellant] from his time in the county as a deputy with the Sheriff's department. She also stated that for a time they both lived in the same apartment building, but that she has never had a face-to-face conversation with the [Appellant.]" With regard to Juror Hyre's February 13, 2008, MySpace posting "that she had arrived home from court and would be returning the next day[,]" the court found that

> [s]he did not state which trial she was hearing or any facts or opinions about the trial.

> [Juror Hyre] indicated in her testimony that the reason she did not disclose this internet contact with the [Appellant] when the Court asked during *voir dire* if any jurors knew the [Appellant], was because she does not feel that she really knows the [Appellant] as these e-mails represent the entirety of their relationship.

The trial court also addressed Appellant's argument that Juror Hyre "should not have been on the [Appellant's] jury due to, what the Court believes are very tenuous connections with witnesses that appeared at the trial." With little discussion, the court found that Juror Hyre had a "very weak connection" to witness Brenda Slaughter and further found that Juror Hyre "is friends with the daughter of County Commissioner and witness Theresa Frame. [Juror Hyre] testified that she is friends with Ms. Frame's daughter, but she has never spoken with Theresa Frame." Finally, the trial court stated:

> If the Court is to require every juror to disclose that he or she knows not just the witness, but if the juror knows the witness' family, or if the juror's family knows the witness, the court will have great difficulty in selecting juries. In a rural area with a small population, it is not unusual to have jurors with varying connections with parties and witness. The issue is if the juror can be fair and impartial. The Court believes that Ms. Hyer [sic] was fair and impartial, and that her links to the Defen-

dant and witnesses were not such that she was biased or prejudiced against Defendant. She did not personally know the Defendant or the witnesses in question, and she did not have any knowledge of the case beyond what was presented at trial.

It is from the trial court's August 11, 2008, order denying Appellant's motion for new trial that Appellant now appeals.[9]

## II. Standard of Review

■ This Court reviews the trial court's August 11, 2008, order denying Appellant's motion for new trial under the following standard of review:

> 'In reviewing challenges to findings and rulings made by a circuit court, we apply a two-pronged deferential standard of review. We review the rulings of the circuit court concerning a new trial and its conclusion as to the existence of reversible error under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard. Questions of law are subject to a *de novo* review.' Syllabus Point 3, *State v. Vance*, 207 W.Va. 640, 535 S.E.2d 484 (2000).

Syl. Pt. 1, *Phares v. Brooks*, 214 W.Va. 442, 590 S.E.2d 370, 371 (2003). *See* Syl. Pt. 3, *Human Rights Comm. v. Tenpin Lounge, Inc.*, 158 W.Va. 349, 350, 211 S.E.2d 349, 350 (1975) ("If it be determined that a juror falsely answered a question on *voir dire* examination, whether or not a new trial should be awarded is within the sound discretion of the trial court.") With this standard of review to guide us, we proceed to address the allegations raised in this appeal. *See State v. Hutchinson*, 215 W.Va. 313, 319, 599 S.E.2d 736, 742 (2004) ("In determining whether there has been an abuse of discretion, we must evaluate each case on its own facts." (citations omitted)).

## III. Discussion

■ At issue in this appeal is whether Juror Hyre's complete lack of candor during *voir dire* regarding her connections to Appel-

---

9. As indicated above, Appellant also filed motions for new trial on the grounds that the State misused subpoenas and violated Appellant's Fifth Amendment rights. The court's August 11, 2008, order denied these motions as well.

lant and witnesses Frame and Slaughter resulted in prejudice to Appellant to the extent that he did not receive a fair trial.

It is axiomatic that a criminal defendant has a fundamental and constitutional right to trial by an impartial and objective jury. As we held in syllabus point four of *State v. Peacher*, 167 W.Va. 540, 280 S.E.2d 559, 563 (1981),

> The right to a trial by an impartial, objective jury in a criminal case is a fundamental right guaranteed by the Sixth and Fourteenth Amendments of the United States Constitution and Article III, Section 14, of the West Virginia Constitution. A meaningful and effective voir dire of the jury panel is necessary to effectuate that fundamental right.

Indeed, "a criminal defendant is entitled to insist upon a jury 'composed of persons who have no interest in the case, have neither formed nor expressed any opinion, who are free from bias or prejudice, and stand indifferent in the case.'" *State v. Ashcraft*, 172 W.Va. 640, 647, 309 S.E.2d 600, 607 (1983) (*quoting State v. McMillion*, 104 W.Va. 1, 8, 138 S.E. 732, 735 (1927) *overruled on other grounds State v. Harden*, 223 W.Va. 796, 679 S.E.2d 628 (2009)). To that end, this Court has long recognized the process of *voir dire*, meaning "to speak the truth," *Michael v. Sabado*, 192 W.Va. 585, 592, 453 S.E.2d 419, 426 (1994) as the parties' "opportunity to discover[ ] whether there are any 'relevant and material matters that might bear on possible disqualification of a juror.'" *Id.*, (*quoting Tenpin Lounge*, 158 W.Va. at 355, 211 S.E.2d at 353). As we stated in *State v. Derr*, 192 W.Va. 165, 174, 451 S.E.2d 731, 740 (1994), "[o]ne of the ways this fundamental right [to a fair trial] is achieved is by *voir dire* which allows both the litigants and the trial court to discover any bias or prejudice a juror may harbor." Thus, we have held that

> '[t]he official purpose[ ] of *voir dire* is to elicit information which will establish a basis for challenges for cause and to acquire information that will afford the parties an intelligent exercise of peremptory challenges.' Syl. Pt. 2, in part, *Michael*, 192 W.Va. 585, 453 S.E.2d 419 (1994).

Syl. Pt. 3, *State ex rel. Nationwide Mut. Ins. Co. v. Karl*, 222 W.Va. 326, 328, 664 S.E.2d 667, 669 (2008). *See Ashcraft*, 172 W.Va. at 648, 309 S.E.2d at 608. "Clearly, then, a fair trial requires a meaningful and effective *[v]oir dire* examination." *Tenpin Lounge*, 158 W.Va. at 355, 211 S.E.2d at 353.

Juror Hyre's repeated lack of candor clearly undermined the purpose of *voir dire* and, as a result, deprived Appellant of the ability to determine whether she harbored any prejudices or biases against him or in favor of the State. *See Derr*, 192 W.Va. at 174, 451 S.E.2d at 740. Simply put, Juror Hyre's reticence during *voir dire* foreclosed any challenge for cause or use of a peremptory challenge by Appellant. Nevertheless, following the June 11, 2008, hearing, the trial court concluded that Juror Hyre had been a "fair and impartial juror" and "that her links to [Appellant] and witnesses were not such that she was biased or prejudiced against [Appellant]." In past cases, this Court has determined that "'[a]ctual bias can be shown either by a juror's own admission of bias or by proof of specific facts which show the juror has such prejudice or connection with the parties at trial that bias is presumed.' Syllabus Point 5, *State v. Miller*, 197 W.Va. 588, 476 S.E.2d 535 (1996)." Syl. Pt. 1, *O'Dell v. Miller*, 211 W.Va. 285, 286, 565 S.E.2d 407, 408 (2002). We are particularly mindful that "'[t]he process of identifying bias or prejudice, except in clear cases, can be a delicate one where the conclusion is finally drawn from the totality of the responses.'" 211 W.Va. at 289, 565 S.E.2d at 411 (*quoting* Daniel J. Sheehan, Jr. and Jill C. Adler, *Voir Dire: Knowledge is Power*, 61 Tex. B.J. 630, 634 (1998)).

In the case *sub judice*, the totality of Juror Hyre's responses during the June 11, 2008, coupled with her repeated silence during *voir dire*, leads this Court to conclude that she had such connection with Appellant and witnesses Frame and Slaughter that bias must be presumed. *O'Dell*, at syl. pt.1. Consequently, Appellant's motion for new trial should have been granted.

When the trial court addressed the prospective jurors as a whole and asked whether

any of them knew Appellant or any of the named witnesses, several of the jurors candidly disclosed their ties to Appellant and to several of the witnesses. The trial court proceeded to further question those prospective jurors in an effort to determine whether they could fairly and impartially consider the evidence and render a verdict without bias or prejudice. Though Juror Hyre was present when the other jurors advised the court of their ties to Appellant and several witnesses and were asked to give further details, she was apparently not to be persuaded thereby, as she elected not to reveal any information about her connections to either Appellant or witnesses Frame and Slaughter.

Juror Hyre's claim that she remained silent because did not personally "know" Appellant belies the fact that, at the very least, she *believed* she knew him well enough to give him advice about his divorce. In her February 7, 2008, MySpace message to Appellant, she wrote, "I dont know you very well But I think you could use some advice!" In stating "I dont know you *very well,*" it is obvious that Juror Hyre felt she knew Appellant to some degree; in other words, she at least believed herself to be familiar enough with Appellant such that she proceeded to offer him spiritual counsel. Juror Hyre's familiarity with Appellant is further suggested by her message's closing remark of "[t]alk soon." Furthermore, Juror Hyre formerly lived in the same apartment complex as Appellant but did not reveal that information either. During the June 11, 2008, hearing, Juror Hyre admitted she used "bad judgment" by not being forthcoming with the court and also admitted that God was telling her that she should honestly answer the question, but that she "disobeyed." Moreover, Juror Hyre testified that if given the opportunity to do it all over again, she would have told the court that she knew Appellant. Conspicuously absent from the trial court's August 11, 2008, order denying Appellant's motion for new trial is any discussion or acknowledgment of Juror Hyre's testimony in this regard.

With respect to Juror Hyre's ties to witness Frame, Juror Hyre was completely uncommunicative regarding the court's *voir dire* question as to whether any of the jurors was "related by blood or connected by marriage" to any of the witnesses. Despite this very specific question, Juror Hyre did not advise the court that witness Frame's daughter is her sister-in-law. Our review of the June 11, 2008, hearing transcript reveals that Juror Hyre offered no explanation to the trial court as to why she did not disclose her "connection by marriage" to Mrs. Frame. The trial court's order completely fails to address this fact. Juror Hyre testified only that she did not "know" Mrs. Frame, which is why, she explained, that she did not reveal her close, personal friendship with Mrs. Frame's daughter. For the same reason, Juror Hyre did not disclose the fact that her brother-in-law worked for witness Slaughter.

We are mindful that "[j]ury service is a civic duty that citizens are expected to perform willingly when called upon to do so. But there is a fine line between being willing to serve and being anxious.... The individual who lies in order to improve his chances of service has too much of a stake in the matter to be considered indifferent." *Dyer v. Calderon,* 151 F.3d 970, 982 (9th Cir.) *cert. denied, Calderon v. Dyer,* 525 U.S. 1033, 119 S.Ct. 575, 142 L.Ed.2d 479 (1998). Indeed, "the quality of indifference ... along with impartiality, is the hallmark of an unbiased juror." *Id.* In this case, we hold that the trial court was clearly wrong in finding Juror Hyre to be a "fair and impartial juror." To the contrary, as demonstrated by the facts set forth above, Juror Hyre intentionally and repeatedly failed to be forthcoming about her connections to Appellant and witnesses Frame and Slaughter, arguably, in order to improve her chances of serving on Appellant's jury. Whatever her reasons for doing so, she cannot be considered to have been indifferent or unbiased. *Id.* Accordingly, we find that the trial court abused its discretion in denying Appellant's motion for new trial.[10] We, therefore, reverse the court's

---

10. Having concluded that Appellant is entitled to a new trial based upon Juror Hyre's misconduct, we need not address Appellant's other assignments of error.

August 11, 2008, order and remand this case for a new trial.[11]

### IV. Conclusion

For the reasons set forth above, the order of the Circuit Court of Braxton County entered August 11, 2008, is reversed and this case is remanded for a new trial.

Reversed and remanded.

**11.** As noted above, Juror Hyre posted a message on her MySpace page during the course of the trial in which she wrote, "Amber Just got home from Court and getting ready to get James and Head to church! Then back to court in the morning!" Next to "mood," she wrote the word "blah." The trial court found that Juror Hyre "did not state which trial she was hearing or any facts or opinions about the trial." Though this Court does not condone any communication about a case by a sitting juror, we agree with the trial court's apparent finding that Juror Hyre's posting was benign in nature. We believe that, standing alone, it was not sufficient to find that she engaged in juror misconduct. However, we also believe some cautionary words are warranted concerning the prominent presence of the internet and routine use of and dependence upon various technologies by everyday Americans called to jury service. In an effort to preclude jurors from using cell phones, computers and social media websites such as MySpace, the Committee on Court Administration and Case Management of the Judicial Conference of the United States has endorsed a model jury instruction for federal district court judges to help deter jurors from using such technology for improper purposes (such as communicating about their case or conducting their own research). [*Rules for Jurors: No Talking, Texting, Tweeting,*] The National Law Journal, February 9, 2010, *available at* http//www.law.com/jsp/lawtechnology news/PubArticleLTN.jsp?id=1202442983764.

For example, the jury instruction to be given before trial cautions, *inter alia:*

> I know that many of you use cell phones, Blackberries, the internet and other tools of technology. You also must not talk to anyone about this case or use these tools to communicate electronically with anyone about the case.... You may not communicate with anyone about the case on your cell phone, through e-mail, Blackberry, iPhone, text messaging, or on Twitter, through any blog or website, through any internet chat room, or by way of any other social networking websites, including Facebook, MySpace, LinkedIn, and You-Tube."

The jury instruction to be given at the close of the case similarly provides:

> During your deliberations, you must not communicate with or provide any information to anyone by any means about this case. You may not use any electronic device or media, such as a telephone, cell phone, smart phone, iPhone, Blackberry or computer; the internet, any internet service, or any text or instant messaging service; or any internet chat room, blog, or website such as FaceBook, MySpace, LinkedIn, YouTube or Twitter, to communicate to anyone any information about this case or to conduct any research about this case until I accept your verdict.

We note that, presently, there are no similar uniform standards for jurors in state trials. *Id.*