702 S.E.2d 619

**STATE of West Virginia, Plaintiff Below, Appellee,**

v.

**Gregg Dulaney SMITH, Defendant Below, Appellant.**

**No. 35489.**

Supreme Court of Appeals of West Virginia.

Submitted Sept. 21, 2010.

Decided Oct. 27, 2010.

Rocco E. Mazzei, Esq., Clarksburg, WV, for Appellant.

Darrell V. McGraw, Jr., Attorney General, R. Christopher Smith, Esq., Assistant Attorney General, Charleston, WV, for Appellee.

PER CURIAM:

The Appellant, Gregg Dulaney Smith (Defendant), appeals his convictions for the offenses of one count of attempted first degree murder, one count of malicious assault with a shotgun, one count of malicious assault with a hammer, and one count of wanton endangerment involving a firearm. On appeal, the Defendant makes the following assignments of error: (1) the trial court erred by not disqualifying the prosecuting attorney whom the defendant had named as a witness; (2) the sentences of imprisonment imposed upon him are disproportionate to the nature and character of his offenses and therefore violate Article III, Section 5 of the Constitution of West Virginia; (3) the trial court erred in not ruling on his motion for a new trial; (4) the evidence was insufficient to support a conviction for attempted first degree murder; and (5) the trial court erred by not suppressing video evidence provided to the State by the victim. Having fully considered the rec-

ord and the briefs of the parties, we affirm the defendant's convictions and sentences.

## I. Background

The events underlying the defendant's offenses were recorded on a home video surveillance system. This video footage shows that on September 7, 2007, the defendant walked out of his house carrying a shotgun. Upon exiting his house, the defendant walked to the trunk area of his car which was parked in his driveway. A few feet away the victim, Tom Smith (Mr. Smith), was working on his car.[1] The video shows Mr. Smith working on his car for several hours before the defendant exited his house with the shotgun.[2] Mr. Smith had his back to the defendant when the defendant came out of his house. Upon noticing the defendant, Mr. Smith turned his head and looked over his shoulder at the defendant carrying the shotgun. After observing the defendant for a few seconds, Mr. Smith turned his head away from the defendant and returned to the work he was doing on his car. At this time the defendant, with no provocation apparent from the video surveillance footage, set down the shotgun and aggressively approached Mr. Smith. Upon reaching Mr. Smith, the defendant reached down and picked up a claw hammer that Mr. Smith had been using to work on his car and began violently swinging it at Mr. Smith, striking Mr. Smith in the head and arms. Mr. Smith is observed on the video footage struggling to hold the defendant's arms to keep the defendant from further striking him with the hammer. The momentum of the struggle took Mr. Smith and the defendant approximately eight feet from the front of Mr. Smith's car to the rear of the defendant's car, where the defendant grabbed his shotgun.

Mr. Smith is then seen trying to push the shotgun away and attempting to restrain the defendant's other arm to prevent the defendant from hitting him again with the hammer. Within seconds of grabbing the shotgun, the defendant dropped the hammer and, putting both hands on the shotgun, turned it towards Mr. Smith's stomach. Mr. Smith pushed the shotgun downwards, and the defendant struggled to bring it back up. The momentum of the struggle over the shotgun took the defendant and Mr. Smith out of the line of sight of the surveillance camera; however, within seconds the defendant shot Mr. Smith in the leg, essentially severing it. After shooting Mr. Smith in the leg, the defendant beat Mr. Smith in the head with a trash can and a heavy object. Mr. Smith's ten year old son, Tristan, can be seen on the surveillance video rushing to where his father lay on the ground.

As a result of the defendant's attack, Mr. Smith suffered serious injuries. These injuries included a broken arm and hand and the amputation of the lower portion of Mr. Smith's leg.[3]

Following the attack, the defendant was arrested and indicted by a Ritchie County Grand Jury for the offenses listed above. The defendant exercised his right to trial by jury and was subsequently found guilty on all charges. At sentencing, the trial court imposed the maximum sentences permitted by law and ordered them to run consecutive to each other, for an effective sentence of not less than twelve years, nor more than thirty-five years in the West Virginia State Penitentiary.

It is from those convictions and sentences that the defendant now appeals.

## II. Standard of Review

The defendant has raised five assignments of error. For purposes of clarity, the appropriate standard of review is set forth in our discussion of each of the assigned errors.

## III. Discussion

### Motions to Disqualify the Prosecuting Attorney

■ The defendant argues that the trial court erred in refusing a defense motion to

---

1. There is no indication in the record that the Defendant and the victim, while sharing the same last name, are related.

2. The defendant's and Mr. Smith's driveways were parallel to each other, and separated by approximately three feet.

3. Mr. Smith had several surgeries in the effort to save his leg, including a surgery where muscle from his back was removed and grafted to his leg.

disqualify the prosecuting attorney and by failing to rule on the defendant's renewed motion to disqualify the prosecuting attorney. In Syllabus Point 2 of *Walker v. West Virginia Ethics Commission*, 201 W.Va. 108, 492 S.E.2d 167 (1997), we held that:

> [i]n reviewing challenges to the findings and conclusions of the circuit court, we apply a two-prong deferential standard of review. We review the final order and the ultimate disposition under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard. Questions of law are subject to a *de novo* review.

The record reflects that the defendant initially moved to disqualify the prosecuting attorney because the defendant wanted the prosecutor to testify that Mr. Smith was a dangerous person and that a "videotape in the possession of [the prosecutor] would be part of that evidence and there may be issues with regard to the authenticity or chain of custody of such tape." On February 12, 2008, a hearing on the motion was held by the trial court. At the hearing the prosecuting attorney informed the trial court that he did not have possession of the video referenced by the defendant and that he was never a part of the chain of custody of that video. The trial court denied the motion to disqualify the prosecuting attorney, finding that the video had been maintained by law enforcement officials. The trial court also found that the video in question had been made by the defendant and, as such, ruled that "the defendant can use the tape in any manner which he sees fit."

At some point thereafter, the defendant fired his trial counsel and obtained new counsel. On August 7, 2008, the defendant renewed his motion to disqualify the prosecuting attorney. The second motion to disqualify the prosecutor was premised on the defendant's intent to call the prosecutor as a fact witness. The substance of the prosecutor's expected testimony was that the defendant had spoken with the prosecutor on at least three occasions prior to the incident

with Mr. Smith. In these discussions, one of which was an in-person meeting where the defendant brought legal counsel with him, the defendant relayed "the difficulty [he] was having with [Mr. Smith]" and sought the prosecutor's "assistance and advice as to how to deal with the situation." The defendant proffered that the prosecutor would testify as to the defendant's unsuccessful efforts to get the prosecuting attorney to file charges against Mr. Smith or obtain a "peace bond" against Mr. Smith.

Simultaneous with filing the renewed motion to disqualify the prosecuting attorney, the defendant filed an amended witness list naming the prosecuting attorney as a fact witness for the defense. The defendant also obtained and served on the prosecuting attorney a witness subpoena. After being served with the subpoena, the prosecutor moved to have it quashed, arguing that the issue had already been decided by the trial court.

■ The record does not reflect that the trial court ruled on the renewed motion to disqualify the prosecuting attorney; however, the record also shows that the defendant took no further action to prosecute the motion after it was filed.[4] Reviewing the record, we do not find that the trial court's failure to address the renewed motion to disqualify the prosecuting attorney constitutes reversible error.

The defendant did not object or bring to the trial court's attention that the renewed motion to disqualify remained a pending motion, even though the record reflects that the trial court, prior to commencement of the trial, asked defendant's counsel if the defense was ready to proceed, to which defendant's counsel responded "Yes, your Honor." Our review of the record fails to find that the defendant, at any point during the trial, raised the issue of the outstanding motion with the trial court which would have provided the trial court the opportunity to address that issue. Moreover, while the defendant had identified the prosecuting attorney as a

---

4. We note for the record that the defendant's appellate counsel did not represent the defendant at his trial below.

witness and even served a witness subpoena on him, the defendant did not call the prosecutor to the stand which would have forced the trial court to address the issue.

■ Had the issue been properly raised, the defendant would not have been entitled to disqualify the prosecuting attorney under our standard for disqualifying opposing counsel when opposing counsel may be called as a witness. In Syllabus Point 3 of *Smithson v. U.S. Fidelity & Guaranty Company,* 186 W.Va. 195, 411 S.E.2d 850 (1991), we held that:

> When an attorney is sought to be disqualified from representing his client because an opposing party desires to call the attorney as a witness, the motion for disqualification should not be granted unless the following factors can be met: First, it must be shown that the attorney will give evidence material to the determination of the issues being litigated; second, the evidence cannot be obtained elsewhere; and, third, the testimony is prejudicial or may be potentially prejudicial to the testifying attorney's client.

The defendant ostensibly wanted the prosecutor to testify that the defendant met with the prosecutor prior to the defendant's attack on the victim regarding complaints he had about Mr. Smith, and also to testify that the defendant had sought to have criminal charges prosecuted against Mr. Smith for a battery. The defendant was not entitled to disqualify the prosecuting attorney because the substance of the prosecutor's proposed testimony was obtained from other witnesses at trial and, therefore, the defendant failed to meet the second prong of our standard in *Smithson.* One of the witnesses providing the substance of the prosecutor's proposed testimony was attorney Berkeley Simmons. Attorney Simmons testified that he had been retained by the defendant, prior to the defendant's attack on Mr. Smith, for the purpose of helping the defendant address the problems he was having with Mr. Smith. As part of his assistance to the defendant, Attorney Simmons testified that he personally contact-

ed the prosecuting attorney in June 2007 and arranged a meeting between the defendant and the prosecutor. At that meeting, Attorney Simmons recalled that the defendant complained to the prosecuting attorney that Mr. Smith had, on a repeated basis, "harassed him, intimidated him and his family including acts of [vandalism] and other misconduct." When asked of the outcome of the meeting, Attorney Simmons testified that he did not "know that anything was resolved," but that he did recall that the prosecutor had discussed the possibility of a "mutual peace bond."

In addition to Attorney Simmons, the defendant called David Richards, who was the Chief of Police for the Pennsboro Police Department in Ritchie County. Chief Richards testified that he had filed a criminal complaint against Mr. Smith for battery because Mr. Smith was alleged to have "pushed [the defendant] in the back." A video of that incident—Defendant's Exhibit 2, which is also the same video that formed the basis for the defense's first motion to disqualify—was introduced by the defense and admitted into evidence without objection. Chief Richards testified that the battery complaint was later dismissed on motion of the prosecuting attorney because "the state cannot prove this case beyond a reasonable doubt." The motion to dismiss, as well as the criminal complaint against Tom Smith, were admitted into evidence.

It is clear from our review of the record that there was no basis to disqualify the prosecuting attorney. The substance of the prosecutor's testimony was obtained from other witnesses. Therefore, the defendant's motion failed to meet the standard set forth in *Smithson* for disqualifying a party opponent's legal counsel.

### Proportionality of Sentences

■ The defendant argues that the sentences imposed upon him are grossly disproportionate to the character and degree of his offenses, and therefore in violation of Article III, Section 5 of the *Constitution of West Virginia.*[5] In Syllabus Point 1 of *State v.*

---

**5.** Article III, Section 5 of the *Constitution of West Virginia* provides that:

Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual

*Lucas,* 201 W.Va. 271, 496 S.E.2d 221 (1997), we held that "[t]he Supreme Court of Appeals reviews sentencing orders, including orders of restitution made in connection with a defendant's sentencing, under a deferential abuse of discretion standard, unless the order violates statutory or constitutional commands." We have also held that "[s]entences imposed by the trial court, if within statutory limits and if not based on some [im]permissible factor, are not subject to appellate review." Syllabus Point 4, *State v. Goodnight,* 169 W.Va. 366, 287 S.E.2d 504 (1982).

■ Having reviewed the record and statutes under which the defendant has been sentenced, we find that the sentences imposed upon him are within statutory limits. We further find that the defendant has not alleged that his sentences were based on any constitutionally impermissible factor such as race or religion. As Justice Cleckley aptly noted in his concurring opinion in *State v. Head,* 198 W.Va. 298, 306, 480 S.E.2d 507, 515 (1996), "[c]ircuit court judges have a right to believe that so long as they have not violated a law or acted in a nefariously discriminatory way in imposing sentences, this Court will not sift through the nooks and crannies of their decisions determined on finding that which is not there." We continue to subscribe to that well stated principle of judicial review.

■ We find that the defendant has not shown the sentences imposed by the trial court are in excess of that permitted or required by statute or to have been based on some impermissible constitutional factor.[6]

### Failure to Rule on the Defendant's Motion for New Trial

[8] The defendant's third assignment of error is that the circuit court failed to rule on his Motion for New Trial. The record shows that on January 30, 2009, the defendant filed a motion for a new trial, setting forth therein two grounds. First, the defendant argued that Defendant's Exhibit 2—a video purporting to show a battery being committed upon the defendant by Mr. Smith—was not sent into the jury room with the rest of the evidence. Second, the defendant argued that there was insufficient evidence to support a conviction for attempted first degree murder. In its response to this assigned error, the State argues that the defendant's motion for a new trial was time-barred pursuant to Rule 33, *West Virginia Rules of Criminal Procedure.*[7] We agree.

Rule 33 requires that a motion for new trial, based on grounds other than newly discovered evidence, *be filed* "within ten days after verdict or finding of guilty or within such further time as the court may fix during the ten-day period." In the case before us, the verdicts were returned on September 5, 2008 and the trial court ordered the verdicts "spread upon the record." The defendant was immediately remanded to custody "pending post trial motions." The defendant's mo-

---

punishment inflicted. Penalties shall be proportioned to the character and degree of the offence. No person shall be transported out of, or forced to leave the State for any offence committed within the same; nor shall any person, in any criminal case, be compelled to be a witness against himself, or be twice put in jeopardy of life or liberty for the same offence.

6. Arguments that a defendant's sentence violates the proportionality requirement of Article III, Section 5 of the *Constitution of West Virginia* are properly raised in a *habeas* proceeding, where a record can be made of the evidence and argument supporting a defendant's contention that his or her sentence is disproportionate to the character and degree of the offense. Because we do not address the defendant's proportionality arguments on the merits—other than concluding that it is not properly raised on direct appeal—the defendant is not barred from raising that

issue in a petition for writ of *habeas corpus ad subjiciendum.*

7. *West Virginia Rules of Criminal Procedure,* Rule 33 [1995] provides as follows:

The court on motion of a defendant may grant a new trial to that defendant if required in the interest of justice. If trial was by the court without a jury the court on motion of a defendant for a new trial may vacate the judgment if entered, take additional testimony, and direct the entry of a new judgment. A motion for a new trial based on the ground of newly discovered evidence may be made only after final judgment, but if an appeal is pending the court may grant the motion only on remand of the case. A motion for a new trial based on any other grounds shall be made within ten days after verdict or finding of guilty or within such further time as the court may fix during the ten-day period.

tion for a new trial was filed on January 30, 2009, and was more than four months untimely.

While we find that the motion for a new trial was untimely, we also note that the second ground set forth in the motion—that the evidence was insufficient evidence to support a conviction for attempted murder—is a specifically assigned error in this appeal and will therefore be addressed in this Opinion. With regard to the first ground set forth in the defendant's motion for a new trial—that defendant's Exhibit 2 was not sent to the jury room—the record before us contains no evidence, not even a proffer or an affidavit, to support the defendant's assertions that defendant's Exhibit 2 was not sent to the jury room. While the defendant alleges that the video cart and television used to display the Exhibit were seen in the hallway outside the jury's chambers, and that a bailiff informed defendant's counsel that the jury did not want the equipment in the chambers, that fact alone does not mean that Defendant's Exhibit 2 was not sent into the jury room with all of the other evidence. Had defendant's counsel been concerned with the fact that the cart and monitor were not in the jury room, counsel could have brought it to the attention of the trial court at that time. If it had been promptly brought to the trial court's attention, the trial court would have been provided the opportunity to correct the situation to the extent that anything required correcting and, at a minimum, a record could have been made on the issue. Instead, for reasons unclear from the record, the defendant chose not to complain about this "issue" until several months after the trial. This delay was not timely and we find that the defendant failed to properly preserve the issue for appeal.

### Insufficiency of the Evidence

 The defendant's fourth assignment of error is that the evidence adduced at trial was insufficient to support a verdict of attempted first degree murder. We disagree. In Syllabus Point 1 of *State v. Guthrie*, 194 W.Va. 657, 461 S.E.2d 163 (1995), we set forth our standard of review for cases making a challenge to the sufficiency of the evidence. This standard is as follows:

The function of an appellate court when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, is sufficient to convince a reasonable person of the defendant's guilt beyond a reasonable doubt. Thus, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt.

Reviewing the record before us "in the light most favorable to the prosecution," it is abundantly clear that "any rational trier of fact could have found the essential elements of the [defendant's] crime [of attempted first degree murder] proved beyond a reasonable doubt." *Id.* This evidence includes the defendant's testimony and other, more empirical, evidence.

At trial, the defendant testified that immediately preceding the attack he went to place a shotgun in the trunk of his car and, while in the process of doing that, was told by his neighbor Tom Smith that he had a flat tire. The defendant testified that he then walked around the side of his car to look at the tire. The defendant contended that it was at this point that Mr. Smith told the defendant that he was going to hit him with a hammer, at which time he "got it before [Tom Smith] could get it." [8] When asked why he swung the hammer at Mr. Smith, the defendant responded that he could not "believe [he] swung it at him" because he had never done anything like that in his life. When asked why he swung the hammer at him again after the first time, the defendant said that "I guess I was afraid [Mr. Smith] was going to, you know, come after me again." When asked why he picked up the shotgun, the defendant testified that he only picked it up because he "did not think it would be very good to just let it sit there in the driveway

---

8. Based on video evidence, there was a very small distance between where Mr. Smith was standing in his driveway and where the defendant's car was parked in the defendant's driveway—approximately eight feet.

with [Mr. Smith] out there" and that his intent was to go back inside his house and call the police.

The video surveillance evidence introduced at the trial portrays a completely different sequence of the events than those described by the defendant in his testimony. The video shows Mr. Smith to have been working on his car over a period of several hours prior to the defendant's attack. As the defendant left his house and approached the trunk of his car, Mr. Smith, who was a few feet away at his car, looked over his shoulder (Mr. Smith's body remained turned away from the defendant) in the direction of the defendant who was carrying the shotgun.

After a few seconds of looking in the defendant's direction, Mr. Smith returned his focus to the work he was doing on his car. When Mr. Smith turned away, the defendant aggressively rushed over to where Mr. Smith was leaning over his vehicle, grabbed a hammer that Mr. Smith had been using to work on his car, and began swinging it at Mr. Smith. Mr. Smith can be seen raising his arms in an effort to protect his head and face from the hammer blows. Mr. Smith succeeds in grabbing the defendant's arm to prevent the defendant from again swinging the hammer at him, at which time Mr. Smith and the defendant struggle for several seconds, the momentum of that struggle carrying them approximately eight feet to the back of the defendant's car. When reaching the back of the defendant's car, the defendant reaches for and picks up the shotgun, pointing it at Mr. Smith, at which time Mr. Smith struggled to not only push the barrel of the shotgun away, but continue to hold the hammer-wielding arm of the defendant. Seconds later, the defendant drops the hammer and places both hands on the shotgun, turning it towards Mr. Smith's stomach, while Mr. Smith continued to struggle to push the barrel away. It was during this struggle that the defendant shot Mr. Smith.

There is no indication on the video that Mr. Smith did anything on the day of the attack to threaten the defendant, the defendant's family or the defendant's property. The evidence of record was sufficient to prove the defendant was the aggressor in an attack completely unprovoked by the victim, Mr. Smith, and that the defendant intended to murder Mr. Smith, first with hammer blows to Mr. Smith's head and then with a shotgun blast.

We find the defendant's argument that the evidence was insufficient to support a conviction for attempted first degree murder to be without merit.

### Admission of Video Evidence

 The defendant's final assignment of error is that the trial court erred by admitting into evidence the video of the defendant's attack on Mr. Smith. The defendant argues that the video was inadmissible because its contents had been illegally obtained from him by Tom Smith. At a hearing on the defendant's motion to exclude the video, the evidence established that both Mr. Smith and the defendant had wireless home video surveillance systems. It was also established that it was from a camera on the defendant's surveillance system that footage of the attack was transmitted.

According to the testimony, Mr. Smith's system received images on the same frequency as that transmitted by the defendant's camera. Being aware of this frequency cross-over, Mr. Smith had previously programmed his computer to capture and record any video feed transmitted by the defendant's wireless camera. After being shot by the defendant, Mr. Smith informed law enforcement officers responding to the 911 call that the entire incident had been recorded and asked them to get the recording from his computer. The investigating officers went to Mr. Smith's computer and transferred a copy of the surveillance footage to a compact disc. It is that surveillance video footage that the defendant argues should have been excluded by the trial court on the basis that he had a privacy expectation in the video footage captured by Mr. Smith and Mr. Smith's interception of the video feed from his camera violated that right.

 Assuming *arguendo* that the defendant is accurate in his assertion that he had a privacy expectation in the wireless video transmission and that Mr. Smith violated

that right by viewing and recording it,[9] this Court nonetheless concludes that the defendant did not have a basis to exclude this evidence at his criminal trial. In Syllabus Point 1 of *State v. Oldaker,* 172 W.Va. 258, 304 S.E.2d 843 (1983), we held that, in criminal trials, the "United States Constitution, Amendment IV, and West Virginia Constitution, Article III, § 6, do not apply to searches by private individuals unless they are acting as instruments or agents of the State." Our rationale in *Oldaker,* for not applying the Fourth Amendment or Article III, Section 6 of the *West Virginia Constitution* to searches by private individuals, also extends to seizures by private persons. In *Sutherland v. Kroger Company,* 144 W.Va. 673, 683, 110 S.E.2d 716, 723 (1959), we observed that:

> [t]he constitutional provisions in the State and Federal Constitutions prohibiting unreasonable searches and seizures, ... are only applicable to the State and Federal Governments and not to private individuals.

In *Burdeau v. McDowell,* 256 U.S. 465, 475, 41 S.Ct. 574, 65 L.Ed. 1048 (1921), the United States Supreme Court also discussed this issue, holding that:

> The Fourth Amendment gives protection against unlawful searches and seizures, and as shown in the previous cases, its protection applies to governmental action. Its origin and history clearly show that it was intended as a restraint upon the activities of sovereign authority, and was not intended to be a limitation upon other than governmental agencies; as against such authority it was the purpose of the Fourth Amendment to secure the citizen in the right of unmolested occupation of his dwelling and the possession of his property, subject to the right of seizure by process duly issued.

In the present case the record clearly shows that no official of the Federal Government had anything to do with the wrongful seizure of the petitioner's property, or any knowledge thereof until several months after the property had been taken from him[.] It is manifest that there was no invasion of the security afforded by the Fourth Amendment against unreasonable search and seizure, as whatever wrong was done was the act of individuals in taking the property of another. A portion of the property so taken and held was turned over to the prosecuting officers of the Federal Government. We assume that petitioner has an unquestionable right of redress against those who illegally and wrongfully took his private property under the circumstances herein disclosed, but with such remedies we are not now concerned.

In the present appeal, there is no evidence to prove that Mr. Smith was acting as an instrument or agent of the state. Mr. Smith received a wireless signal being transmitted by the defendant's camera and the contents of that wireless transmission were recorded by Mr. Smith on his personal computer. After the defendant's attack, Mr. Smith gave a copy of that recording to police. We do not find the trial court erred in admitting the video surveillance footage captured by the victim, Mr. Smith.

## IV. Conclusion

For the reasons set forth herein, the defendant's convictions and sentences are affirmed.

Affirmed.

---

9. The record indicates that as of the time of the defendant's sentencing, a civil action had been filed by Mr. Smith against the defendant. We are careful in our language today to be clear that we make no finding on the issue of whether the defendant's rights had been violated by Mr. Smith's ability to view and record the wireless transmissions emanating from the defendant's wireless security camera. Our finding is limited to concluding that because Mr. Smith was a private citizen and was not acting in concert with the police in the recording of the wireless transmissions, our precedent does not require suppression of that evidence in a criminal proceeding.