IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2015 Term

**FILED**

**May 22, 2015**

released at 3:00 p.m.
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

No. 14-0321

STATE OF WEST VIRGINIA,
Plaintiff Below, Respondent

v.

WILLIAM B. MURRAY
Defendant Below, Petitioner

Appeal from the Circuit Court of Harrison County
The Honorable John Lewis Marks, Jr., Judge
Criminal Action No. 12-F-201-1

AFFIRMED

Submitted: May 12, 2015
Filed: May 22, 2015

Steven B. Nanners, Esq.
Law Offices of Nanners & Willet, L.C.
Buckhannon, West Virginia
Attorney for the Petitioner

Patrick Morrisey, Esq.
Attorney General
David A. Stackpole, Esq.
Assistant Attorney General
Charleston, West Virginia
Attorneys for the Respondent

CHIEF JUSTICE WORKMAN delivered the Opinion of the Court.

SYLLABUS BY THE COURT

1.      "The function of an appellate court when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, is sufficient to convince a reasonable person of the defendant's guilt beyond a reasonable doubt.  Thus, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt."  Syl. Pt. 1, *State v. Guthrie*, 194 W. Va. 657, 461 S.E.2d 163 (1995).

2.      "A criminal defendant challenging the sufficiency of the evidence to support a conviction takes on a heavy burden.  An appellate court must review all the evidence, whether direct or circumstantial, in the light most favorable to the prosecution and must credit all inferences and credibility assessments that the jury might have drawn in favor of the prosecution.  The evidence need not be inconsistent with every conclusion save that of guilt so long as the jury can find guilt beyond a reasonable doubt. Credibility determinations are for a jury and not an appellate court.  Finally, a jury verdict should be set aside only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt.  To the extent that our prior cases are inconsistent, they are expressly overruled."  Syl. Pt.  3, *State v. Guthrie*, 194 W. Va. 657, 461

i

S.E.2d 163 (1995).

3. "Although premeditation and deliberation are not measured by any particular period of time, there must be some period between the formation of the intent to kill and the actual killing, which indicates the killing is by prior calculation and design. This means there must be an opportunity for some reflection on the intention to kill after it is formed." Syl. Pt. 5, *State v. Guthrie*, 194 W. Va. 657, 461 S.E.2d 163 (1995).

4. "'When an attorney is sought to be disqualified from representing his client because an opposing party desires to call the attorney as a witness, the motion for disqualification should not be granted unless the following factors can be met: First, it must be shown that the attorney will give evidence material to the determination of the issues being litigated; second, the evidence cannot be obtained elsewhere; and, third, the testimony is prejudicial or may be potentially prejudicial to the testifying attorney's client.' Syllabus Point 3, *Smithson v. U.S. Fidelity & Guaranty Company*, 186 W. Va. 195, 411 S.E.2d 850 (1991)." Syl. Pt. 1, *State v. Smith*, 226 W. Va. 487, 702 S.E.2d 619 (2010).

5. "To trigger application of the 'plain error' doctrine, there must be (1) an error; (2) that is plain; (3) that affects substantial rights; and (4) seriously affects the fairness, integrity, or public reputation of the judicial proceedings." Syl. Pt. 7, *State v.*

*Miller*, 194 W. Va. 3, 459 S.E.2d 114 (1995).

6.    ""The action of a trial court in admitting or excluding evidence in the exercise of its discretion will not be disturbed by the appellate court unless it appears that such action amounts to an abuse of discretion." Syllabus point 10, *State v. Huffman*, 141 W. Va. 55, 87 S.E.2d 541 (1955), *overruled on other grounds*, *State ex rel. R.L. v. Bedell*, 192 W. Va. 435, 452 S.E.2d 893 (1994).' Syllabus Point 1, *State v. Calloway*, 207 W. Va. 43, 528 S.E.2d 490 (1999)."  Syl. Pt. 1, *State v. Harris*, 216 W. Va. 237, 605 S.E.2d 809 (2004).

Workman, Chief Justice:


This case is before the Court upon the appeal of the Petitioner William B. Murray from his jury convictions of first degree murder without mercy and concealment of a deceased human body.  The Petitioner was sentenced to life without mercy for his first degree murder conviction and not less than one nor more than five years for his concealment of a deceased human body conviction.  The trial court ordered the sentences to be served concurrently.  The Petitioner argues that the trial court erred:  1) by denying his motion for a judgment of acquittal[1] as the State failed to prove premeditation and malice, which are required elements of the offense of first degree murder; 2) by refusing to disqualify the Harrison County Prosecuting Attorney's Office when the assistant prosecutor who tried the case became a potential witness during trial preparations; 3) by failing to conduct an in camera hearing due to juror misconduct that allegedly occurred during the deliberations and further by failing to order a mistrial regarding this issue; 4) by allowing the State to play a video recording to the jury of the Petitioner at the Harrison County Sheriff's Department; and 5) by failing to redact or limit impermissible vouching of the co-defendant's plea agreement. Based upon a review of the parties' briefs and oral arguments, the appendix record and all other matters submitted before the Court, we affirm the trial court's decision.

---

[1]*See* W. Va. R. Crim. P. 29.

## I. Facts and Procedure Below

According to the evidence at trial, in December of 2011, the Petitioner and his co-defendant, Clayton Collins ("Collins"), as well as the victim, T.J. Blankenship ("T.J"), were all residing together in a home near Clarksburg, West Virginia. The testimony was that the three men were like brothers. The Petitioner's girlfriend, Crystal Kirkland, and Collins's girlfriend, Melissa Arbogast, also resided in the home.[2]

During December, the relationship between the three men, however, became very tense, when items were stolen from the Petitioner's father. Trooper First-Class Martin Bailey with the West Virginia State Police testified that on December 17, 2011, he responded to a call about a burglary made by Beth Cunningham, the Petitioner's father's girlfriend. Ms. Cunningham reported that two computers and a television had been stolen from them. According to the testimony of Ms. Arbogast, the Petitioner and his co-defendant, Collins, discovered that the victim, T.J., had stolen the items from the Petitioner's father and was hiding them in Collins's truck while trying to sell them. According to Collins, when he and the Petitioner found the stolen computers in the truck, the Petitioner called his father, who came and retrieved them. Nothing was said to T.J. at that time.

---

[2]The Petitioner's eight-year-old son was also present in the home prior to the murder.

Ms. Arbogast and Collins[3] both testified that after the Petitioner and Collins discovered that T.J. was the culprit, they met with the Petitioner's father about the theft. They did not want to notify the police about T.J. being the thief as they worried that T.J. would inform law enforcement about their own criminal activities, which included drug use. Consequently, Collins and the Petitioner, along with the Petitioner's father, decided that they would retaliate against T.J. by beating him up. As Collins testified, they were going to do this by "possibly breaking his fingers, or his knees, or something." The Petitioner's father offered to forgive a debt that Collins owed him and to give both Collins and the Petitioner drugs in exchange for attacking T.J. The initial plan was to wait until after the first of January 2012.

The plan to wait, however, changed on December 28, 2011, due to a confrontation between T.J. and Collins. Collins testified that early in the morning on December 28, T.J. awakened the Petitioner when he returned home from work.[4] Collins said that he, T.J., Ms. Kirkland and the Petitioner "hung out for a little while." At some point, T.J. "start[ed] kind of running his mouth" about "getting ripped off." Both Collins and the

---

[3]Collins, who was charged with first degree murder, conspiracy to commit murder and concealment of a deceased human body, testified as part of a plea agreement with the State. In exchange for his testimony, Collins would be allowed to plead guilty to second degree murder and concealment of a deceased human body. He also agreed to a recidivist proceeding being brought against him. Collins had not pleaded guilty at the time he testified.

[4]The Petitioner and another individual, Joe Cashdollar, had been collecting metal.

3

Petitioner were angry with T.J. Collins testified that he and the Petitioner went upstairs and discussed confronting T.J. that night with their knowledge that T.J. had stolen the computers and T.V. from the Petitioner's father. According to Collins, they were going to kick him out of the house and beat him up. The two men put their plan in motion by telling Ms. Kirkland to take the Petitioner's son and Ms. Arbogast in Collins's truck and leave the house for a while. Ms. Arbogast corroborated Collins's testimony, stating that Collins told her to get Ms. Kirkland and the Petitioner's son and leave because "[t]here's probably going to be a fight."

Collins testified that shortly after they left, he and the Petitioner confronted T.J. Collins told T.J. "he was busted on stealing the laptops, and that we had returned the laptops." T.J. "got pretty irrate [sic]." According to Collins, the Petitioner "backed up what I was saying." Collins also testified that T.J. denied the accusation and "[a]t that point, he [referring to T.J.] gets up and charges at me." Collins further testified that T.J. pushed him into a wall and was holding him there by Collins's throat; Collins then grabbed a large wrench off the table and hit T.J in the head with it two or three times. After being hit, Collins stated that T.J. let Collins go. According to Collins, T.J. then turned and went back and sat down on the couch where he slumped over. Collins testified that T.J. did say something, but he couldn't make out the words. Collins testified that he dropped the wrench onto the floor.

4

According to Collins, he then started to walk out the door, because he "was kind of just overwhelmed." Collins testified that while he was walking towards the door, the Petitioner picked up the wrench and repeatedly hit T.J. in the head.[5] Collins testified that he heard "kind of like a dull thunk." Collins stated that he proceeded to go outside for a few minutes and when he came back into the house, the Petitioner said that T.J. had "peed himself," and was dead.[6] The Petitioner then told Collins that "we got to get rid of him."[7]

Collins testified that the Petitioner began cutting up the carpeting upon which T.J. had urinated. The Petitioner then rolled T.J. off the couch and onto the floor. They rolled T.J. up in the carpet. They carried the couch, which had T.J.'s blood on it, out of the house and set the couch on fire. They also called their girlfriends and told them to return with Collins's truck. When the girlfriends returned, Collins gave them some gas cans and

---

[5]Collins's original statement to the police did not include the Petitioner also hitting T.J. with the wrench. Collins testified that he was trying to protect the Petitioner because he considered the Petitioner a friend.

[6]The Chief Medical Examiner for the State of West Virginia, Dr. Allen Mock, testified that the cause of T.J.'s death was "blunt force injuries to the head." Dr. Mock further testified that "[t]here was a complex series of skull fractures that intertwined," and that any of the blows could have killed T.J.

[7]Lindsey Tharp, who identified herself as the former girlfriend and friend of Collins and T.J's girlfriend at the time of his death, testified that she had a conversation with the Petitioner about T.J after T.J.'s death, but before his body was discovered. Ms. Tharp was trying to locate T.J. The Petitioner told Ms. Tharp that T.J. was gone, but that he didn't know where he was. According to Ms. Tharp, the Petitioner also told her that "T.J. got hit." When she asked the Petitioner who hit T.J., the Petitioner said "who do you think. And got this smile on his face." Ms. Tharp took the Petitioner's smile to mean that he had hit him.

5

money. He told the women to take a van that belonged to the Petitioner and his girlfriend and go fill up the cans with gasoline. After the women left a second time, Collins and the Petitioner proceeded to load T.J.'s body in the back of the truck. The Petitioner wanted to dump the body in a river and Collins testified that he wanted to bury T.J. somewhere.

Once their girlfriends returned with the gasoline, Collins and the Petitioner put the gas in the truck with the carpet and T.J.'s body. The two then drove to a riverbank in Arden, near Phillipi, in Barbour County. They dug a hole in the damp soil on the riverbank and dumped the body in the hole and covered it up. After disposing of the body, they drove "somewhere else" and burned the carpet.

T.J.'s body was discovered approximately two weeks later. Ms. Arbogast contacted the police and identified both the Petitioner and Collins as having been involved in the killing. The Petitioner was arrested on January 16, 2012. He was indicted on three charges: murder, conspiracy to commit murder and concealment of a deceased human body. The State voluntarily dismissed the conspiracy charge prior to trial. His trial began on July 9, 2013, and ended on July 16, 2013.

Based upon the evidence presented at trial, the jury found the Petitioner guilty

of the murder and concealment of a deceased human body charges.[8]  The jury did not recommend mercy.  On February 18, 2014, the Petitioner was sentenced to life in prison without mercy and a concurrent term of one to five years for concealment of a deceased human body.  It is from this conviction and sentence that the Petitioner now appeals.

## II.  Standard of Review

The Petitioner has asserted several assignments of error involving various legal principles and differing standards of review.  Thus, we will address the applicable standard of review within the discussion section regarding each assigned error.

## III.  Discussion

### A.  Sufficiency of the Evidence

The first issue raised by the Petitioner concerns whether the trial court erred in denying the Petitioner's motion for a judgment of acquittal on the murder charge.  The Petitioner argues that there was insufficient evidence of premeditation and malice.  He contends that the State relied solely upon the testimony of his co-defendant to establish the Petitioner's involvement in the crimes in this case.  The Petitioner maintains that he was "added into the mix by Clayton S. Collins after the plea agreement" and that Collins's version of what transpired does not show premeditation or malice.  Conversely, the State

---

[8]The Petitioner neither testified nor presented any witnesses on his behalf.

7

maintains that there was sufficient evidence offered to support the jury's findings of premeditation and malice. The State contends that the Petitioner's argument on this issue requires the Court to ignore Collins's testimony. Additionally, the State maintains that despite the fact that Collins testified to the Petitioner's involvement in the murder, and that this testimony was different from his earlier statements to police, Collins was subject to cross-examination and the defense was able to challenge his credibility before the jury.

This Court applies the following standard of review to challenges concerning the sufficiency of the evidence:

> The function of an appellate court when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, is sufficient to convince a reasonable person of the defendant's guilt beyond a reasonable doubt. Thus, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt.

> A criminal defendant challenging the sufficiency of the evidence to support a conviction takes on a heavy burden. An appellate court must review all the evidence, whether direct or circumstantial, in the light most favorable to the prosecution and must credit all inferences and credibility assessments that the jury might have drawn in favor of the prosecution. The evidence need not be inconsistent with every conclusion save that of guilt so long as the jury can find guilt beyond a reasonable doubt. Credibility determinations are for a jury and not an appellate court. Finally, a jury verdict should be set aside only when the record contains no evidence, regardless of how it

is weighed, from which the jury could find guilt beyond a reasonable doubt. To the extent that our prior cases are inconsistent, they are expressly overruled.

Syl. Pts. 1 and 3, *State v. Guthrie*, 194 W. Va. 657, 461 S.E.2d 163 (1995).

The Petitioner focuses upon the alleged lack of evidence establishing two necessary elements to prove first degree murder – premeditation and malice. *See State v. Horn*, 232 W. Va. 32, 39, 750 S.E.2d 248, 255 (2013) ("To sustain a conviction for this category of first degree murder, it is essential that 'the State produce [ ] evidence that the homicide was a result of malice . . . and was deliberate and premeditated [.]' Syl. pt. 3, in part, *State v. Hatfield*, 169 W. Va. 191, 286 S.E.2d 402 (1982)."). Regarding proof of premeditation, we have previously held that

> [a]lthough premeditation and deliberation are not measured by any particular period of time, there must be some period between the formation of the intent to kill and the actual killing, which indicates the killing is by prior calculation and design. This means there must be an opportunity for some reflection on the intention to kill after it is formed.

*Guthrie*, 194 W. Va. at 664, 461 S.E.2d at 170, Syl. Pt. 5. Furthermore,

> [t]he duration of that period cannot be arbitrarily fixed. The time in which to form a deliberate and premeditated design varies as the minds and temperaments of people differ and according to the circumstances in which they may be placed. Any interval of time between the forming of the intent to kill and the execution of that intent . . . is sufficient to support a conviction for first degree murder.

*Guthrie*, 194 W. Va. at 664, 461 S.E.2d at 179, Syl. Pt. 6, in part. Finally, concerning the

9

element of malice, we have explained that "[m]alice may be inferred from the intentional use of a deadly weapon[.]" Syl. Pt. 2, in part, *State v. Brant*, 162 W. Va. 762, 252 S.E.2d 901 (1979); Syl. Pt. 3, *State v. Toler*, 129 W. Va. 575, 41 S.E.2d 850 (1946).

The evidence at trial supports the jury's determination that the elements of premeditation and malice were proven beyond a reasonable doubt. Premeditation was established by the evidence that after watching his co-defendant Collins's beating of the victim in the head, the Petitioner picked up the wrench and struck the victim in the head several more times. The Petitioner's conduct was sufficient evidence of a calculated, premeditated act under our law. Additionally, the use of a large wrench, and the evidence that the Petitioner continued to hit T.J. on the head[9] while T.J. was sitting slumped on the couch after the initial attack by Collins, is sufficient evidence from which a jury could easily find malice. *See Brant*, 162 W. Va. at 762, 252 S.E.2d at 901, Syl. Pt. 2, in part.

## B. Disqualification of Prosecuting Attorney's Office

The next issue raised by the Petitioner concerns whether the trial court should have disqualified the Harrison County Prosecuting Attorney's Office based upon the

---

[9]As the chief medical examiner testified at trial, T.J. was struck in the head multiple times with such force that the result was "complex" fractures and depression of T.J.'s skull. Any of the blows, including those inflicted by the Petitioner, could have caused the victim's death.

Petitioner's assertion that assistant prosecuting attorney, Traci M. Cook, became a potential witness in the case during her trial preparation of potential witness, Crystal Kirkland, the Petitioner's girlfriend. The State, however, argues that Ms. Kirkland's change in her story during a pre-trial meeting with the assistant prosecutor is not a sufficient basis to disqualify the prosecutor's office from the case.

The salient facts regarding this issue are that Ms. Kirkland first gave a statement to police that the intent of Collins and the Petitioner was to beat up T.J. for stealing the Petitioner's father's computers. During trial preparation with Ms. Cook, Ms. Kirkland changed her story to include the Petitioner and Collins discussing their intent to kill T.J. The Petitioner filed a pre-trial motion to disqualify the prosecutor's office. The Petitioner argued in his motion that "Crystal Kirkland is the only witness the State has that provides direct evidence of a conspiracy to murder the victim" and that Ms. Kirkland's changing her statement was motivated by "her desire to avoid prosecution by cooperating with the State." According to the Petitioner, Ms. Cook was an "essential witness as to the circumstances of the witness'[s] change of story." The trial court denied the motion, finding that the witness's change in her statement during questioning by Ms. Cook during trial preparations did not cause Ms. Cook to become a witness. Rather, the trial court found that the motion was premature and that the court would revisit the issue if Ms. Kirkland testified and if she testified in such a manner that Ms. Cook's testimony was necessary for impeachment.

11

Subsequent to the trial court's ruling, the State dismissed the conspiracy charge against the Petitioner; Ms. Kirkland was never called as a witness either by the State or by the Petitioner.

The standard of review applicable to this Court's review of a trial court's refusal of a defendant's motion to disqualify a prosecuting attorney is as follows:

> In reviewing challenges to the findings and conclusions of the circuit court, we apply a two-prong deferential standard of review. We review the final order and the ultimate disposition under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard. Questions of law are subject to a *de novo* review.

*State v. Smith*, 226 W. Va. 487, 491, 702 S.E.2d 619, 623 (2010) (quoting Syl. Pt. 2, *Walker v. W. Va. Ethics Comm'n*, 201 W. Va. 108, 492 S.E.2d 167 (1997)).

In syllabus point one of *Smith*, this Court held:

> "When an attorney is sought to be disqualified from representing his client because an opposing party desires to call the attorney as a witness, the motion for disqualification should not be granted unless the following factors can be met: First, it must be shown that the attorney will give evidence material to the determination of the issues being litigated; second, the evidence cannot be obtained elsewhere; and, third, the testimony is prejudicial or may be potentially prejudicial to the testifying attorney's client." Syllabus Point 3, *Smithson v. U.S. Fidelity & Guaranty Company*, 186 W. Va. 195, 411 S.E.2d 850 (1991).

226 W. Va. at 487, 702 S.E.2d at 619, Syl. Pt.1.

Succinctly stated, applying the law established by the Court in *Smith* to the instant matter, there is no merit to the Petitioner's argument concerning this issue. The State dismissed the conspiracy charge and therefore did not call Ms. Kirkland as a witness. Further, there is no evidence as to how the defense was unable to call Ms. Kirkland because of the trial court's ruling. The Petitioner simply failed to prove any of the three requisite factors set forth in *Smith* that must be met in order to disqualify an attorney. *Id*. Thus, the circuit court did not err in denying the Petitioner's motion.

## C. Alleged Juror Misconduct

The Petitioner's next error is one of alleged juror misconduct. The Petitioner raises for the first time on appeal that the trial court committed plain error by failing to conduct an in camera hearing on whether there were any improper comments made by a juror, who was replaced by an alternate juror during deliberations, and by failing to order a mistrial on this issue. The State, in turn, maintains that the trial court did not commit plain error.

Regarding this issue, a juror realized during the initial deliberations in this case that she had worked with the Petitioner's ex-wife. The ex-wife's name is now Ruby King, but the juror knew her as Ruby Murray. Once the juror recognized the relationship, she notified the trial court immediately. The Petitioner's counsel requested the trial court, "out

of an abundance of caution," to replace the juror. Specifically, the Petitioner's counsel, after conferring with his client, stated: "Your Honor, it would be our opinion that it would be safest to excuse her and have the first alternate to serve." The trial court granted the Petitioner's request and instructed the jury to begin their deliberations anew. There was no objection or issue raised by the Petitioner's counsel concerning conducting an in camera hearing and interviewing the remaining jurors to determine whether any of them had been prejudiced by any possible remarks by the excused juror.

In the absence of any objection or issue raised before the trial court regarding the Petitioner's alleged error involving the dismissed juror, the Petitioner asks the Court to review this alleged error under the plain error doctrine. As we held in syllabus point seven of *State v. Miller*, 194 W. Va. 3, 459 S.E.2d 114 (1995), "[t]o trigger application of the 'plain error' doctrine, there must be (1) an error; (2) that is plain; (3) that affects substantial rights; and (4) seriously affects the fairness, integrity, or public reputation of the judicial proceedings." "By its very nature, the plain error doctrine is reserved for only the most egregious errors." *State v. Adkins*, 209 W. Va. 212, 215 n.3, 544 S.E.2d 914, 917 n.3 (2001).

The Petitioner relies upon this Court's decision in *State v. Dellinger*, 225 W. Va. 736, 696 S.E.2d 38 (2010), to support his claim of plain error. In *Dellinger*, after the defendant was convicted, his lawyer brought to the trial court's attention information about

14

possible juror misconduct. *Id*. at 737-38, 696 S.E.2d at 39-40. A juror had previously lived in the same apartment complex as the defendant and had befriended the defendant over social media during trial, despite having denied any prior knowledge of, or relationship with, the defendant during voir dire. The juror also failed to disclose to the trial court that she was the sister-in-law to one of the witnesses and her brother-in-law worked for another witness. *Id*. at 739-40, 696 S.E.2d at 40-41. In *Dellinger*, due to the juror's complete lack of candor with the trial court during voir dire, this Court concluded that the juror "had such connection with Appellant and [the] witnesses . . . that bias must be presumed." *Id*. at 741, 696 S.E.2d at 43 (citing Syl. Pt. 1, *O'Dell v. Miller*, 211 W. Va. 285, 286, 565 S.E.2d 407, 408 (2002) ("Actual bias can be shown either by a juror's own admission of bias or by proof of specific facts which show the juror has such prejudice or connection with the parties at trial that bias is presumed." Syl. Pt. 5, *State v. Miller*, 197 W. Va. 588, 476 S.E.2d 535 (1996)). We therefore concluded that the trial court erred in denying the defendant's motion for a new trial. *Dellinger*, 225 W. Va. at 741, 696 S.E.2d at 43.

Unlike the facts in *Dellinger*, in the instant case, the juror came forward as soon as she realized that she might know the Petitioner's ex-wife. There was no lack of candor demonstrated by the juror that would have caused the trial court to question whether the juror had any bias or prejudice toward the Petitioner or the witnesses. Moreover, any potential harm was cured by the trial court in dismissing the juror, at the Petitioner's request,

15

and replacing her with the alternate. Further, the trial court directed the jury, which was early in its deliberation, to start its deliberations anew with the alternate juror. This decision was not error, let alone an egregious-type error, that would have required this Court to apply the plain error doctrine.

### D. Video Recording

The next issue is whether the trial court erred in allowing the State to play a video recording of the Petitioner at the Harrison County Sheriff's Department over the Petitioner's objection. The Petitioner argues that the video recording evidence is prejudicial and should have been excluded by the trial court. The State argues that the evidence was properly admitted at trial.

According to the appendix record, the video recording at issue is of a conversation between the Petitioner and his girlfriend, Ms. Kirkland, captured by a closed-circuit video camera at the Harrison County Sheriff's Office. According to the testimony of Sgt. Robert G. Waybright, a deputy with the sheriff's office, prior to any arrest, both the Petitioner and Ms. Kirkland voluntary went with the deputy to the department for questioning. Sgt. Waybright interviewed both Ms. Kirkland and the Petitioner. Prior to interviewing Ms. Kirkland again, she was placed in the interview room with the Petitioner. The video shows Ms. Kirkland sitting with the Petitioner. Sgt. Waybright testified that

16

they were talking really low, basically, whispering.

But you could tell that Mr. Murray was very aggravated, very upset with Crystal. At one point, he had actually made a hand motion, like this, acting as though he was going to strike her.

And basically, told her – again it's very difficult, the modulation was very low. You couldn't really understand what they were saying. But at one point he said something like, I told you to keep your mouth shut. And he does a hand motion, like he's going to backhand her.

The Petitioner's lawyer objected to the State's motion to play the video for the jury solely on the basis that "the probative value of this evidence is far exceeded by its prejudicial impact."[10] After an in camera review of the video recording, the trial court found it admissible. The trial court also instructed the jury that some of the recording was difficult to hear and that "to the extent that you perceive any variation between what someone else thinks is on the recording, and what you think is on the recording, you are to be guided solely by what you think is on the recording."

As we have previously held:

"'The action of a trial court in admitting or excluding evidence in the exercise of its discretion will not be disturbed by the appellate court unless it appears that such action amounts to an abuse of discretion.' Syllabus point 10, *State v. Huffman*,

---

[10]Rule 403 of the West Virginia Rules of Evidence provides that otherwise relevant evidence may be excluded "if its probative value is substantially outweighed by a danger of . . . unfair prejudice."

141 W. Va. 55, 87 S.E.2d 541 (1955), *overruled on other grounds*, *State ex rel. R.L. v. Bedell*, 192 W. Va. 435, 452 S.E.2d 893 (1994)." Syllabus Point 1, *State v. Calloway*, 207 W. Va. 43, 528 S.E.2d 490 (1999).

Syl. Pt. 1, *State v. Harris*, 216 W. Va. 237, 605 S.E.2d 809 (2004).

The trial court did not abuse its discretion allowing the video recording into evidence. The video recording showed that the Petitioner was aggravated and angry with his girlfriend for talking with police about T.J.'s death. The video recording was relevant and the prejudice to the Petitioner was not outweighed by the probative value of the evidence. *See* W. Va. R. Evid. 403.

### E. Co-Defendant's Plea Agreement

Finally, the Petitioner asserts that the trial court erred in allowing the State to tell the jury that Collins's plea agreement obligated Collins to testify truthfully. This alleged error stems from Collins's testimony that part of his plea agreement included the requirement that he "offer truthful testimony." Directly following the description of the plea agreement, at the close of Collins's direct examination, the trial court gave the jury a cautionary instruction regarding the jury's consideration of the plea agreement.[11] The Petitioner's

---

[11]The trial court instructed the jury as follows:

Ladies and gentlemen, let me instruct you at this point, that
(continued...)

18

counsel never objected to the description of the plea agreement or the trial court's instruction. Further, the Petitioner never asked the trial court to redact any portion of the co-defendant's plea agreement.

Given the lack of any objection by the Petitioner's counsel to the condition of

---

[11](...continued)

you've heard evidence that this witness intends to plead guilty to a crime which arose out of the same events for which the defendant is on trial here.

The intended plea is not evidence, that the defendant on trial is guilty, or that the crime charged in the indictment was committed.

You may consider this witness's guilty plea or intended guilty plea only for the purpose of determining how much, if at all, to rely upon his testimony.

The guilt or innocence of the defendant on trial, Mr. Murray, must be determined solely by you, and solely by the evidence introduced in the trial of this case.

Now, you've also heard testimony from this witness that he may have made a statement to the police, not under oath, before this trial. And that, that statement may be different than his testimony here in court.

To the extent that a statement made before trial, that's not under oath was brought to your attention, it's only brought to your attention to help you decide how believable the witness's court testimony is.

You cannot use it as proof of anything else. You can only use it as one way of evaluating his testimony here in court.

And again, this evidence is admitted for the limited purpose only, and is not admitted as proof of the defendant's guilt on the present charge.

The trial court gave the same instruction at the conclusion of Collins's cross-examination.

19

the plea agreement that Collins had to provide "truthful" testimony, for the Petitioner to prevail this Court would have to find that the trial court committed plain error in allowing the terms of the plea agreement to be admitted at trial. *See Miller*, 194 W. Va. at 6,459 S.E.2d at 117, Syl. Pt. 7. We decline to do so. The trial court made a proper, discretionary, evidentiary ruling to allow the co-defendant's plea agreement to be admitted for purposes of assessing the witness's credibility. *See* Syl. Pt. 4, *State v. Swims*, 212 W. Va. 263, 569 S.E.2d 784 (2002) ("During the direct examination of a co-defendant, a prosecutor may elicit testimony regarding the co-defendant's plea agreement, and may actually introduce the plea agreement into evidence for purposes which include, but are not necessarily limited to: (1) allowing the jury to accurately assess the credibility of the witness; (2) eliminating any concern by the jury that the government has selectively prosecuted the defendant; and (3) explaining how the witness has first-hand knowledge of the events about which he/she is testifying.").

## IV. Conclusion

Based upon the foregoing, the trial court's decision is affirmed.

Affirmed.

20